(23 App. Div. 608.)

### WEISS v. HERLIHY.

(Supreme Court, Appellate Division, First Department. December 31, 1897.)

1. INJUNCTION—POLICE SUPERVISION.
    In an action by a lessee of premises in New York City to restrain the captain of the police precinct from keeping police officers stationed continuously therein, to the injury and threatened destruction of plaintiff's business, it appeared upon plaintiff's motion for injunction pending the

action that, while the premises were nominally employed for a legitimate business as a restaurant and for the sale of liquor, they were in reality carried on as a resort for men of notorious evil reputation, and as a common gambling establishment, and that it had proved impossible for the police to prevent their use for the latter purpose by mere periodical visits. *Held*, that under the principle that he who comes into equity must come with clean hands, the plaintiff was not entitled to relief.

**2. SAME.**

It seems also that, in view of Consolidation Act, § 282, making it the duty of the police force at all times of the day and night to prevent crime and preserve the peace, and to that end authorizing the members thereof to observe carefully and inspect all places of business having excise or other licenses and all gambling houses, the facts failed to present any such clear violation of law as to authorize a court of equity to exercise its discretion to prevent it by a temporary injunction.

Van Brunt, P. J., and Barrett, J., dissenting.

Appeal from special term, New York county.

Action by Thomas Weiss against John D. Herlihy. From an order denying a motion for a temporary injunction, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Alexander Rosenthal, for appellant.

Robert C. Beatty, for respondent.

RUMSEY, J. The plaintiff claims to be the lessee of a portion of No. 34 Second avenue, in the city of New York, in which there has been established, as he says, a restaurant business, which, since the 20th of July, 1897, has been owned by him. The defendant is a captain in the police department in the city of New York, commanding the Fourteenth precinct, in which the plaintiff's restaurant is situated. This action was begun on the 25th day of October, 1897. The plaintiff alleges that since the 12th day of that month the defendant has kept policemen stationed in his restaurant, against his remonstrances and complaints; that he has repeatedly requested the defendant to compel those officers to remove from his premises, but that the defendant has refused to do so, and has insisted upon keeping said officers there until he should be prevented by some higher authority from doing so. The plaintiff says that the continued presence of a police officer, although in plain clothes, in his place of business, has resulted in serious diminution of his business, and falling off of the number of people who have frequented the place, and a decrease in his profits, which amounted, at the time of the bringing of the action, as he says, to about $400. He further alleges that, if the policeman still continues to be stationed in his restaurant, it will result finally in the complete destruction of his business, because his patrons all will have been driven away. The relief demanded is a perpetual injunction restraining the defendant from maintaining the police officer in the plaintiff's place of business, as well as a temporary injunction during the pendency of the action, and, in addition, the damages which the plaintiff claims to have sustained, besides the costs of the action. The defendant, in his answer, substan-

tially admits that since the 12th of October, 1897, he has directed certain officers to remain upon the premises for the purpose of preventing violations of the law thereon, and to enable him to procure evidence against the proprietor and other persons. He alleges that for a long time this place has been a notorious gambling house, and that violations of the law were continually being permitted thereon, and that the officers were stationed there simply to prevent or detect such violations of the law.

Upon the complaint and affidavits, which it is claimed sustain its allegations, the plaintiff procured an order to show cause why a temporary injunction should not be granted substantially as prayed for in the plaintiff's complaint. Upon the hearing of this order to show cause, affidavits were read on the part of the defendant, and it would seem that replying affidavits were permitted to be produced by the plaintiff. The affidavits produced by the defendant establish that this alleged restaurant is upon the ground floor of the building No. 34 Second avenue; that it consists of a room in front, in which are tables and chairs, where customers may sit for the purpose of being served; that immediately in the rear of that is a bar, and back of that is a room, the door of which is kept closed, and access to which is prevented, except to those persons who are specially permitted to go in there, and that this door is fitted with some sort of an aperture through which persons who attempt to enter the room may be examined, so that it can be seen whether it is safe to admit them or not. It appears that before the 20th of July, at which time this business is said to have been bought by the plaintiff, the business had been carried on by one Max Hochstein, who on that day sold it to the plaintiff, and took back, as security for the purchase price, a chattel mortgage upon the property. It is fair to assume, however, from all the testimony in the case, that Hochstein still remained to some extent in charge of the business, and that he was present there a considerable portion of the time. It appears further from the affidavits of the defendant that from and after the month of October, 1896, numerous complaints were made at police headquarters that this place was kept as a common gambling house; that it was investigated thoroughly, and that the reports made to the defendant, as captain of the precinct, were such as to satisfy him that gambling was regularly going on in the back room, but that the room was kept locked; that there was an aperture in the door, especially constructed to observe the movements of any officer who might enter the front room; and that, whenever one did enter, access to the rear room was prevented until the indicia of gambling might be removed, and persons in the room might have an opportunity to escape. At different times during the summer and fall of 1897 various persons were arrested for carrying on gambling on said premises, and upon an examination were held for trial, or to await the action of the grand jury; but it appears that in some of the cases upon the subsequent hearings the charges against those particular persons were not substantiated, and they were not convicted. It does appear, however,

by the testimony of several of the policemen, that at various times
during the early part of the month of October, 1897, and before
this policeman was stationed upon the premises, they had actually
observed gambling going on in this rear room, and they had been
prevented from access to the room, so that they were unable to
ascertain the persons who were engaged in it, or to make any
arrests, but it appears quite satisfactorily from the papers that
whenever the officers inspected the premises the gambling house
was running at full blast, and that it was only while the officer was
actually there that the violation of the law was interrupted.    It
appears, moreover, that Hochstein, who was the owner of this
business before the 20th of July, 1897, and who retained consid-
erable interest in it after that time by reason of his chattel mort-
gage, was a convict who had served a term in the penitentiary for a
petty crime, and that he was a man of notoriously bad character,
and that the place was still a resort of men of notorious evil rep-
utation.    It was made to appear by affidavits presented on the part
of the defendant that the sale of food and meals, which was the
ostensible business carried on at that place, was very small, and
that very few people were in the habit of resorting to it for the
purpose of obtaining any refreshment of that kind.    While the
plaintiff's affidavits endeavor to meet and answer these charges
against this place, yet it is very apparent that in the main they
were true, and that it had acquired and maintained the reputation
of being a common gambling house, and of being conducted prin-
cipally, and almost entirely, for that purpose.

We have, then, established by the evidence this condition of af-
fairs:    The plaintiff is keeping a common gambling house, and a
resort of bad people, in a place which has been notorious as such
for over a year.    His violation of the law is persistent.    It has
been the subject of complaint from many persons who live in the
neighborhood.    The defendant, being the captain of police in
charge of the precinct, is endeavoring to repress that crime.    He
has been utterly unable to do it in any other way than by station-
ing a police officer upon the premises for the purpose of observing
and inspecting what goes on there, and in that way trying to pre-
vent the commission of the crime, as it is his duty to do.    The
question presented upon this appeal is whether, in view of this
state of facts, a court of equity will interpose by the process of
injunction to prevent what is claimed to be a trespass in aid of a
person who is engaged openly and flagrantly in the violation of
the law, so that this open and flagrant violation may continue
without any interruption on the part of the legal authorities.    The
granting of a temporary injunction is to a very considerable extent
discretionary with the court, and in cases where the action is
brought to obtain a permanent injunction, so that, in effect, a tem-
porary injunction gives to the plaintiff all the remedy to which
he would be entitled if he had finally succeeded in the action.    It
is not by any means a matter of course to grant a temporary in-
junction unless the right of the plaintiff is clear, and the injury in-
flicted upon him by the act sought to be restrained is irreparable.

If there is doubt as to the right of the party, or whether the defendant is overstepping the powers which the law gives him, or whether the plaintiff is in such a situation that he is entitled to equitable relief, the arm of the court will not be stretched out to aid the plaintiff, and to give him during the pendency of the action all the relief which he seeks and will obtain by a final judgment. Bearing in mind these rules, which are well settled, let us examine whether the plaintiff has shown a violation of law on the part of the defendant which is so clear that equity should restrain it, and, if that be so, whether the plaintiff himself is in such a situation that he should not receive a benefit from the extraordinary process of a court of equity.

It is the duty of defendant, as a captain of police, to prevent all violations of law in his precinct, and restrain them so far as possible, and, if he is unable to prevent such violations of the law, to arrest the offenders, and, if possible, bring them to punishment. His duty is not solely to arrest those who are guilty of crime, and cause them to be punished for the offenses which they have committed, but it is to preserve order in the precinct, and prevent crime, and this duty is quite as important as the duty of punishing the crime after it has been committed. By section 282 of the consolidation act it is especially made the duty of the police force at all times of the day and night, and the members of such force are thereby empowered, to prevent crime and preserve the public peace. To that end they are authorized to observe carefully and inspect all places of business having excise or other licenses, and all gambling houses, and to prevent violations of all laws and ordinances in force in the city of New York. That section of the statute was not original in the consolidation act, passed in 1882, but it was the law of the state for many years in reference to the city of New York, and it has been continued in the charter of the greater city. Greater New York Charter, § 315. In the plaintiff's place, as is made to appear by the record, there is a bar at which liquors are sold. While the plaintiff does not state that he has a license or a certificate under the liquor law to enable him to lawfully deal in those articles, yet, as he has a bar there, it must be assumed, in the absence of proof to the contrary, that he is lawfully engaged in selling, and therefore that he has an excise license. He has, therefore, one of the places which, having a license to sell liquors, is especially subject to surveillance within the provisions of section 282 of the consolidation act. If anything can be established by evidence, it is thoroughly proved in this case that the house kept by the plaintiff is a common gambling house, and for that reason also it is made the duty of this defendant not only to arrest offenders, but, for the purpose of preventing the crime, to observe carefully and inspect this place at all times of the day and night. That is the duty in which the defendant is engaged, and the only question is whether or not this inspection and observation, either in the extent to which it goes or because of the place where the inspector is stationed, is so clearly a violation of the law that a court of equity will exercise its discretion to restrain it.

The object of the inspection and observation, as shown by the stat-
ute, is not only the punishment of crime, but the prevention of it;
and the latter is even the more important of the two.  So long as
the duty of preventing crime is imposed upon the captain of po-
lice, he certainly must be vested with a broad discretion as to the
strictness of the inspection.  It is his duty to make it so strict that
the violations of law cannot take place, and, unless he goes be-
yond that, the courts will not interfere in that regard.  It cannot
be said, upon the facts shown here, that this inspection is any too
close, because it appears that, before the police officer was sta-
tioned there, the violations of the law were renewed whenever the
visits of the police ceased.

But, if it should be conceded that the plaintiff had established
what would be a good cause of action in equity under ordinary
circumstances, yet we do not think that the facts in this case are
such as to commend him to the equitable jurisdiction of the court,
or within well-settled principles to authorize the court to issue its
extraordinary process for his protection.  The rule is well settled
in equity that he who comes into equity must come with clean
hands; or, as it is otherwise stated, he that hath committed in-
iquity shall not have equity.  This rule, of course, does not go so
far as to deprive one of the privilege of going into equity to en-
force his property rights simply because he is generally of a bad
character, or because he is engaged in some violation of law in
another case than the one in which he seeks an interposition of
the court.  When a court of equity is appealed to for relief, it will
not go outside of the subject-matter of the controversy, and make
its interference depend upon the character and conduct of the
moving party in no way affecting the equitable rights which he
asserts against the defendant.  But, if the rights he asserts, and
for the protection of which he asks the interposition of the equi-
table power of the court, are in themselves essentially illegal, or
a violation of law, then his prayer will be refused, and he will be
left to the ordinary legal remedies, and will not receive any bene-
fit from the equitable powers of a court of justice.  Pom. Eq. Jur.
§ 397 et seq.  That is precisely this case.  This plaintiff, according
to the testimony made to appear upon this record, is persistently
and flagrantly using these premises for a disorderly house, in vio-
lation of the statute.  He asks the help of the equitable power of
the court practically for the purpose of permitting him to continue
that violation of the law.  It is apparent that an injunction could
have no other effect, and that, just so soon as the observation and
inspection of the police was withdrawn from this place, this gam-
bling house would be reopened, to the scandal and inconvenience
of the neighborhood.  A court of equity will not permit its process
to be perverted to any such purpose.  Assume that the legal rights
of this plaintiff are being infringed.  If that be true, he must en-
force them by the proper proceedings at law, and, if he can do so,
undoubtedly his rights will be protected, or he will be recompensed
for any violation of them; but, if the law affords him no protec-
tion, equity will certainly not help him by putting its hand upon

the officers of the law who are seeking to perform their duty, although possibly in a manner oppressive to this plaintiff, and restraining them for no other purpose than that this man may go on with his violations of the law unmolested and unwhipped of justice. If the defendant is violating the law, undoubtedly the law will afford some way for preventing his action, or punishing him if he does it. The plaintiff is clearly doing so in respect of the very matter and for the benefit of the very premises as to which he asks an injunction. For that reason he will receive no aid from the equitable side of the court, but must be left to whatever remedy the law affords him in the matter. For these reasons, the order denying this temporary injunction was correct, and should be affirmed, with costs.

O'BRIEN and INGRAHAM, JJ., concur.

BARRETT, J. (dissenting). The plaintiff is the proprietor of a small restaurant at No. 34 Second avenue, in this city. He seeks in this action an injunction to restrain the defendant, who is the police captain of the Fourteenth police precinct, from stationing police officers permanently within his premises. These officers enter the plaintiff's restaurant every day at 1 o'clock p. m., and remain there all day and all night, with the exception of one hour, which. they allow themselves for dinner elsewhere. They neither eat nor drink in the plaintiff's premises. They simply sit down there, avowedly for the purpose of detecting crime, but thus far, as they acknowledge, finding none. They do this deliberately, and in defiance of the plaintiff's urgent and repeated protests, and they do it under the defendant's express orders. This the latter admits. He also admits that when the plaintiff complained to him upon the subject he not only declined to withdraw his men, but declared with emphasis that, if it was necessary "to continue" (we quote from his answer) "to have officers stationed in said premises until the sign, 'To Let,' was placed upon the windows thereof, he would do so." He now seeks to justify his conduct by saying that his purpose is to prevent gambling on the premises; and he furnishes evidence tending to show that, prior to the adoption of these measures, card playing was on two or three occasions discovered by some of his officers in a room back of the plaintiff's restaurant. He also shows that upon such discovery he secured the arrest of the plaintiff and others for gambling. It appears, however, without dispute, that these arrests proved unavailing, and that whenever they were made the accused persons were either discharged by the police magistrate before whom they were brought, or ultimately acquitted. Upon these facts the defendant expresses his belief that the plaintiff has kept a gambling house upon the premises in question, and he also says that complaints have been repeatedly made to him that the premises were being used for such unlawful purposes. With the exception, however, of the few incidents to which reference has been made, there is no legal evidence to support these complaints, or to warrant the de-

fendant's belief. The suggestion of the defendant's counsel that the plaintiff persistently and flagrantly uses these premises for a disorderly house is not borne out by anything which appears upon the record. The picture which he presents of the plaintiff as a criminal who has the temerity to come into a court of equity, asking it to help him to violate the law, is drawn largely from suspicion and imagination, and not from the actual facts established in the case. This overdrawn picture is in reality a perversion of these facts, the only effect of which is to divert attention from the real question presented, and to prejudice its impartial consideration.

The real question, squarely presented, is whether the police department, in order to detect and punish crime, may lawfully station officers upon the premises of a citizen, and keep them there in anticipation of suspected criminal practices. This is the sole question presented by the actual facts. In its consideration, and, indeed, throughout this discussion, it must be carefully borne in mind that the plaintiff is not seeking to enjoin a threatened arrest, or to try in a court of equity the question whether certain acts constitute a crime. It is well settled that this may not be done. Davis v. Society, 75 N. Y. 362; Kramer v. Police Department, 53 N. Y. Super. Ct. 492; Kenny v. Martin, 11 Misc. Rep. 651, 32 N. Y. Supp. 1087. He makes no attempt to enjoin an arrest, but merely to enjoin what he alleges to be illegal acts of an oppressive character. Nor does he seek to restrain a police official from performing duties imposed upon him by law. Indeed, his sole object is to keep the official within his legal duties; that is, to prevent the defendant from going outside the law to oppress and injure him. We may premise by stating that it is substantially conceded that a private citizen would have no right to remain continuously upon the premises of the plaintiff against his wishes. It is not necessary to consider at length the question discussed by counsel as to the duties of a restaurant keeper towards the public, or wherein these duties differ from those of an innkeeper under the common law. It may, however, be said briefly that the keeper of a public restaurant is only bound to furnish food to such fit persons as apply. When such a person has had a reasonable time to finish his meal and make his preparations for departure, he has no right to remain upon the premises against the will of the proprietor. What greater right, then, has a police official? Plainly none, save such as is expressly or derivatively conferred upon him by law. When such an official invades a citizen's house or shop, and there oversteps the boundaries to which a private individual is limited, the burden is upon him to point to statutory authority in justification of his action. There can be no presumption that the invasion of a man's premises is legal. Apart from the statute, the only presumption is that a police officer possesses the powers of an ordinary peace officer at common law. What, then, is the defendant's claim of authority in the case at bar? The only statutory provision to which he points is section 282 of the consolidation act. That section makes it the duty, in general, of the police, to prevent

crime, and confers specific authority to "observe and inspect" gambling houses and other public places. This authority to "observe and inspect" was not intended to embrace anything approaching to permanent occupation. This is clearly indicated, not only by the terms thus employed, but by the context, and especially by what follows. Thus it is provided by section 285 of the same act that the superintendent of police, upon the report of two or more householders, giving good ground for a belief that any room or premises is being used "as a common gaming room or common gaming premises," may authorize an entry into them by members of the police force, "who may forthwith arrest all persons offending against the law, but none others." This express permission to enter and arrest forthwith, hedged about as it is with safeguards, and applying only to common gaming rooms, is a forcible answer to the claim made here. There are other special provisions, such as section 514 of the Code of Criminal Procedure, permitting search at any time of the person or premises of one adjudged an habitual criminal; and also sections 1998, 2004, and 2013 of the consolidation act, relating to attendance at theatrical exhibitions, which point strongly in the same direction. The doctrine, "Expressio unius est exclusio alterius," may fairly be held to apply. It is apparent, therefore, that the provisions of section 282 of the consolidation act, making it the duty of the police force to prevent crime, to detect and arrest offenders, to carefully observe and inspect all places where business is conducted under an excise or other license, all gambling houses and other evil resorts, and to repress and restrain all unlawful and disorderly conduct or practices therein, afford no warrant for any act in the nature of a permanent occupancy by the police of any such place or resort. The purpose of the statute is to afford the police authority to repress and prevent crime by the specified means, viz. by promptly arresting, with or without warrant, any person or persons who, upon an inspection of the enumerated premises, may be found there violating the law. Such is the plain import of the language used in the last sentence of this section 282. This language is as follows: "And for these purposes, with or without a warrant, to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses." Even this latter provision, being in derogation of liberty, should be strictly construed. Dill. Mun. Corp. (4th Ed.) § 211, and cases there cited. Plainly, then, the purpose of the statute is not to authorize police captains to fill all evil resorts with one or more paid public agents, and require these agents to remain in such resorts as permanent supervisors of the morality or lawful conduct of their inmates and frequenters. It is fair to say that the respondent's counsel hardly questions these principles. But he denies their applicability to the case at bar. What he says, in effect, is that a restaurant is a "public place," and thus comes within the category of ferries, railroad stations, theaters, and public gatherings, at which police officers have always been stationed without question. The fallacy of this argument consists in likening these enumerated "public

places" to the plaintiff's case. The latter's restaurant is not, in any sense, analogous to a ferry, railroad station, theater, or public meeting. The presence of policemen in these latter places is an ordinary and essential public duty, just as much as patrol duty upon the streets or parks. Not so, however, in the case of a private business, where the only public element is a general appeal for support. Ferries and railroads, though the subject of private adventure and gain, are essentially designed for the public benefit. The public has a vital interest in the objects of such business. The localities where such business is conducted are at all times public, in the broad sense of the term. In the case of theaters and public meetings, large numbers of people are brought together upon specified occasions, and for limited periods of time. Then, and there the police power is appropriately exercised to preserve order. But with this exercise the authority ceases. What right, for instance, would a captain of police have to direct his men to remain in a public hall or theater before and after the meeting or performance, to so remain day in and day out, in fact, permanently,—and without regard to the orderly regulation of the premises upon any particular occasion? We cannot but think that this "public-place" argument is strained and unsound. Our conclusion, upon a careful review of the statute, is that the defendant has exceeded his authority both in its terms and scope.

The only remaining question, therefore, is whether he should be enjoined. The rule is well settled that a continuing trespass is remediable by injunction (Wheelock v. Noonan, 108 N. Y. 179, 15 N. E. 67; Carpenter v. Gwynn, 35 Barb. 395; Pom. Eq. Jur. § 1357), and that an injunction may be had against public officers who violate private rights, where the wrong would ordinarily be redressable in equity (People v. Canal Board of New York, 55 N. Y. 390; People v. Dwyer, 90 N. Y. 402). As was said by Allen, J., in the former case:

"That public bodies and public officers may be restrained by injunction from proceeding in violation of law to the prejudice of the public or to the injury of individual rights, cannot be questioned." Page 393, 55 N. Y.

In the case at bar the remedy at law is plainly inadequate. The plaintiff cannot well eject the defendant's officers by force. Any attempt to do this would at once bring him in conflict with the entire police force of the precinct under the defendant's command. To remit the plaintiff to this remedy would be a mockery. Nor would an action at law afford him adequate redress. To secure anything like redress at law, he would have to bring a fresh action each day; and that very consideration is one of the usual grounds upon which equity acts, viz. to prevent a multiplicity of suits. But in no one suit, nor, indeed, in a multiplicity of suits, could the plaintiff establish or secure his damages; and while he was resorting to these practically useless remedies his business would naturally diminish, and be ultimately ruined. The true and only substantial remedy, therefore, for such a continuing wrong as the present, is by injunction. Let us, then, briefly consider some of the technical objections which the respondent alleges against the granting of an injunction pendente lite.

First. He claims that the material allegations of the plaintiff's com-

plaint are denied by his answer and the opposing affidavits. In this, however, he is in error. He confuses his own affirmative allegations of new matter set up as a defense with the material allegations of the plaintiff's complaint. It is proper at this point to inquire, what are the material allegations of the complaint? Eliminating all irrelevant matter, they are, in substance, the plaintiff's ownership of the restaurant business, and the defendant's continuous trespasses to the injury of that business, and to the prejudice of the plaintiff's rights therein. The plaintiff's ownership is not positively denied. It is, in the complaint, positively alleged, while the denial is but on information and belief. There is not, in fact, a particle of legal evidence to gainsay the plaintiff's ownership, and his allegations on that head are fully corroborated by another affiant. Then, too, the continuous trespasses under the defendant's orders are expressly admitted. It would seem to follow that the real equities of the complaint are substantially undenied. They are, in fact, either admitted, or denied on mere information and belief; and, so far as they are thus denied, they are fully proved.

Second. Next the maxim is invoked that one who seeks equity must come into court with clean hands. Here, again, the new matter affirmatively set up by the defendant is confused with real equities of the complaint. The defendant seems to think that, unless a man is a good and worthy citizen, he can have no equity as against wrong and oppression. In our judgment, the plaintiff's good citizenship and general morality have nothing to do with the concrete point presented for consideration. His equities are not founded upon personal qualities or character, nor is he required, as a condition of obtaining equitable relief, to prove his innocence of the charges which induced the defendant to violate his rights. He must, it is true, come into a court of equity with clean hands; that is, with clean hands quoad the very cause of action alleged. If he does this, he fulfills the maxim, although in the abstract he may be persona non grata. In equity, as well as at law, all men are equal.

Lastly, it is claimed that an injunction pendente lite should not be granted, but that the plaintiff should first be remitted to a trial at special term. This would undoubtedly be a correct disposition of the plaintiff's application if the essential facts were in dispute, but, as we have seen, they are not. Even if the defendant's affirmative proofs went much further than they do, still he should be kept within the bounds prescribed by law. We must again assert in this connection, and it cannot be asserted with too great emphasis, that the defendant cannot, under the authority to "observe and inspect," practically take possession of the plaintiff's premises, or plant his officers permanently therein. If we are right in this view of the law, there is surely nothing in doubt which requires to be clarified by a formal trial. Every fact which is essential to raise the question of the plaintiff's right to an injunction clearly appears in the present record. The question now before us, therefore, is distinctly one of legal right, the consideration of which we cannot properly postpone. To postpone consideration of such a question when it is thus squarely presented would be to make the court a passive ally of the wrongdoer. This view does

not lessen our condemnation of the crime here sought to be prevented. Gambling is an undoubted evil, and all lawful means should be invoked and utilized for its suppression; but there is something more important than even the prevention of this evil, and that is the preservation of the fundamental principles upon which civil liberty rests. These principles should never be lost sight of, either in the case of the humble or even of the criminally suspected; and certainly the doctrine should be impressed upon public officers, of all people, that the righteous end does not justify the unlawful means.

The order appealed from should therefore be reversed, with $10 costs and disbursements of the appeal, and the motion for an injunction granted, with $10 costs.

VAN BRUNT, P. J., concurs.