(40 Misc. Rep. 384.)

PEOPLE v. SUMMERS et al.

(Supreme Court, Trial Term, Kings County. April, 1903.)

1. OPPRESSION IN OFFICE—COMPLAINT.
　　A deposition of the complainant showing that he keeps a retail cigar store, and that a police captain and three patrolmen came into his store, and some of them remained there during business hours for 11 days, and that they hurt business, charges oppression within Pen. Code, § 556, providing that a public officer who seizes or levies on another's property unlawfully, or dispossesses another of lands or tenements, or does any act whereby another is injured in his person, property, or rights, is guilty of oppression.

Patrick Summers and others were charged with the crime of oppression under Penal Code, § 556, and move to dismiss on the ground that the facts charged did not show a criminal offense. Denied.

Morgan & Conran, for the prosecution.
P. E. Callahan, for the defense.

GAYNOR, J. The motion to dismiss must be denied; and it seems best to state the law of the case now for guidance on the preliminary hearing. This captain of police, and the three patrolmen who acted under his orders, are charged with the serious crime of official oppression. The last indictment and conviction for this crime in this part of the state were, I think, of Sutherland, who was a party to the lawlessness of the McKane police, who entered houses without warrants, and arrested people without warrants for alleged misdemeanors not committed in their presence, and generally trampled on individual rights in defiance of the law until the community could suffer it no longer.

These defendants now claim that the acts with which they are charged in the complainant's deposition do not make out the crime of oppression. On the decision of this motion it has to be taken as true that they did the acts alleged in such deposition, and what is hereafter said will be on that theory.

Section 556 of the Penal Code which defines the said crime is as follows:

"A public officer, or a person pretending to be such, who, unlawfully and maliciously, under pretense or color of official authority,

"1. Arrests another, or detains him against his will; or,
"2. Seizes or levies upon another's property; or,
"3. Dispossesses another of any lands or tenements; or,
"4. Does any other act whereby another person is injured in his person, property or rights;
"Commits oppression, and is guilty of a misdemeanor."

The deposition states that the complainant keeps a retail cigar and tobacco store; that this police captain, accompanied by these three patrolmen, came into his store on March 12th, and that they remained there in possession all of that day, and then continuously all of the following eleven days, some of them being there all the time from 9 o'clock in the forenoon until 6 o'clock in the afternoon; that they refused to go out on the demand and protest of the complainant; that

they said they were officers and would remain; that their presence in the complainant's store gave him and his store a bad name, and deterred people from coming in and trading with him, thereby injuring him in his good name and business.

These acts fully make out the crime of oppression charged. By section 556 of the Penal Code which has been quoted above, unlawful arrests and detentions by the police, unlawful seizures by them of another's property, and generally any unlawful acts by them "whereby another person is injured in his person, property or rights," constitute the crime of oppression.

It is difficult to conceive how any one so ignorant as to suppose that the police have the right to do what these defendants are charged with could ever be made a captain of police in any community of enlightened American citizens. It does not seem to be explainable at all, except on what might well be deemed the incredible theory that not only ordinary policemen but even police captains are appointed to the police force in the city of New York without any instruction or examination whatever in respect of the rights of individuals, and the limitations on the power of the police to make arrests, or enter houses or private places, or meddle in any way with others; or else on still another theory, namely, that in the past those in official control of the police force have not only sanctioned such acts of police lawlessness, but often required them to be committed, until they grew to be deemed lawful.

The principal duty of the police is to be in the streets and public places, and there preserve the public peace, and keep outward order and decency. When they are allowed or required to depart from this, and obtrude into houses at will, they are thereby enabled to levy extortion and blackmail on the community. It is difficult to conceive how any one who sincerely wants to prevent such extortion and blackmail, and break up all association between the police and certain social offenders, should favor the entry of houses by the police without warrants. The law knows of no greater folly than the notion that the police are the custodians or conservers of the private morals of the community, or could be made such with any safety whatever, or with any possibility of uplifting morals instead of debasing them. The moral growth of a community depends on its churches, schools and teachers, and the influence of a healthy and comfortable home life, and not on the police.

, If these defendants had a warrant for the arrest of the complainant, it was their duty to arrest him and take him before the magistrate. If they had a search warrant, it was their duty to make the search expeditiously and go. If they had no warrant, then their entry into and possession of his place was lawless, and calculated to lead to disorder, for he had a right to resist them with all the force necessary.

It was said on the argument that the floor above the plaintiff's store is occupied by a club of men, and that this captain suspects they play cards for money, or do some kind of gaming, there, and wants to stop them. But that gives no right to the police to enter or stay in the complainant's store. If they had any warrant, whether to arrest any one, or search the club premises, it was their duty to execute

it and go away. If they had no warrant, then their presence was unlawful, whether in the complainant's store or in the club rooms.

The learned counsel for the defendants cites a part of section 315 of the city charter as authorizing the defendants to enter private houses and places without warrants. It purports to make it the duty of the police "at all times of the day and night" to "carefully observe and inspect all places of public amusement, all places of business having excise or other licenses to carry on any business; all houses of ill-fame or prostitution, and houses where common prostitutes resort or reside; all lottery offices, policy shops, and places where lottery tickets or lottery policies are sold or offered for sale; all gambling houses, cockpits, rat pits, and public common dance houses, and to repress and restrain all unlawful and disorderly conduct therein." But this provision is not open to the construction contended for, as the police have been heretofore fully informed. The police may enter and inspect licensed places to a reasonable extent, but they have no such right in respect of private houses and places. They cannot enter the latter at will, or on suspicion, or on what they may choose to call their suspicion. This charter provision only means that they must observe and inspect them from the outside. If it meant more than this it would be void. It is a constitutional principle of government, here and in England, and of free government generally, that one's house may not be entered by the police or by government except under a warrant. The exceptions in the case of pursuing fleeing felons, or persons escaping from arrest, and the like, do not need to be stated here. The trouble with this charter provision is that it is crude and bungling. It mingles lawful and unlawful places together in one common class, and requires the police to inspect them and preserve order in them; whereas there is no such thing as the police standing about and preserving order in the latter places, as in the former, for they cannot be sanctioned or suffered to exist at all. While its true interpretation is plain enough, it is nevertheless open to a false construction which enables the police to claim the right of visitation over houses of ill-fame and gambling houses, for instance. This would enable the police to take such places under their protection and practically license them, and derive a vast fund from them. It seems strange that a provision liable to be used for such a purpose should be permitted to remain in the city charter. The district attorney of New York county, and also of Kings county, have called attention to its loose and dangerous character.

The motion is denied.