(44 Misc. Rep. 1.)

## HALE v. BURNS.

(Supreme Court, Special Term, Kings County. June, 1904.)

1. INJUNCTION—CONTINUING TRESPASS—POLICE OFFICERS.

An injunction will lie to restrain a police captain from keeping his officers permanently in a licensed saloon, and a dining room connected with it, on his suspicion that gambling is being carried on upon the dining-room floor.

Suit by Peter Hale against Joseph Burns to restrain defendant, a captain of police, from a continual trespass on plaintiff's premises. Motion for permanent injunction granted.

Louis H. Reynolds, for plaintiff.
John F. O'Brien, for defendant.

GAYNOR, J. The facts disclosed in this case by the complaint and affidavits are undisputed in all essentials, and it is only necessary to state them to show the outrageous criminal lawlessness being practiced against the plaintiff by this captain of police. The plaintiff has a saloon and restaurant at 193 Washington street, opposite Washington market, in the borough of Manhattan. He is licensed by the state. His saloon is on the ground floor and his eating room on the second floor. Adjoining the eating room is a toilet room for women patrons. Another room on the second floor is leased of him by butchers who have stalls in Washington market. They use it as a clothes room and dressing room, needing such a place near their business. Since February 1, 1904, the defendant has kept police officers, most of the time two, in the plaintiff's place every day from midday until it is closed at night. They stand about, loiter at the women's toilet room, sit in the dining room, interfere with people who come in, sometimes forbid them to go up to the dining room

floor, and sometimes prevent them, and also forbid and prevent the butchers from entering their clothes room. The result is that the butchers have given up their room, and the plaintiff's business has greatly fallen off. He has repeatedly requested the officers to leave his place, but they have always refused, saying that they were there by order of their captain to watch that no gambling took place there. The plaintiff also went with his counsel to the defendant at the station house and demanded that he withdraw the policemen from the plaintiff's place, but he refused, and said he would keep them there until he drove the plaintiff out of his precinct. The excuse given by the defendant in his affidavit for his high-handed and lawless conduct is that he suspects that cards are played for money in a room on the same floor where the plaintiff's dining room is. The room is occupied by an incorporated social club named the Sunnyside Club. He says Matthew Strip is connected with the club, and also frequents the plaintiff's place. The plaintiff has nothing to do with this room, or with the club. The defendant has no evidence of any gaming in the room of the club, or in the plaintiff's rooms, and has not arrested anybody in or about the place, or made a complaint before a magistrate against any such person. He is acting without any warrant or authority whatever, and is evidently under the dangerous delusion that he is an official of unlimited powers, and free to exercise force and violence over any person or place in his precinct. He thinks he has the right to rule with a shillalah or policeman's club. He is either grossly ignorant, or else a willful and dangerous criminal. His acts clearly constitute the crime of oppression, and it is fortunate that they have not provoked violence, and even bloodshed, for the plaintiff has the right to resist them with all the force necessary. When the plaintiff and his counsel saw him he also declared he would drive Matthew Strip and his brother out of his precinct, and would keep his officers in the plaintiff's place so long as he allowed the Strips to come in there. We read of such official conduct in Russia, and profess to be astonished over it, but we have had more of it in the city of New York for the last twenty-five years, and especially during the last eight or nine years, than there has been in any other place in the civilized world. Matthew Strip, whom this police captain assumes to drive out of his precinct, makes affidavit that he is thirty years of age, is married, has lived all of his life in the borough of Manhattan, and in January, 1898, was appointed to the highly exacting and responsible position of chief index clerk in the county clerk's office in New York county, and has ever since held a clerkship in that office, and that he has nothing to do with gambling in the plaintiff's place or in any place. He swears the defendant has a standing grudge against him growing out of past local political contests.

The affidavits of the defendant and his policemen abound in statements of common rumor and suspicion concerning persons who go to the plaintiff's place, and also name some of them as having been arrested by the police in years gone by, but never convicted. The defendant evidently supposes that an arrest by a policeman in the city of New York is proof that the person arrested is a criminal;

but this is not true anywhere, much less in the city of New York, where thousands of grossly illegal and oppressive arrests and trespasses have been made yearly at the instigation of police officials, especially in recent years. The defendant denies that he told the plaintiff that he would drive him out of the precinct, but the evidence that he did so is safely true. He says, however (and it is quite as lawless), that he did state that he would not withdraw his officers from the plaintiff's place "until the Strips had stopped running a gambling place" there; and this without having any evidence whatever that there was ever any gambling there.

This case was argued before me two months ago, but I have refrained from deciding it so that those in authority over this police captain might call him to account for his lawless conduct, and make a decision here unnecessary, for it is irksome to have to repeatedly decide that the police have no right to invade any one's house or place of business without a warrant from a magistrate, except in pursuit of a fleeing criminal, or on a call for help against violence, and the like. The safeguards against such invasions, and against unlawful arrests, which are found in our Constitutions in this country, are the warp and the woof of our system of government, and of free government everywhere. They mark the distinction between free government and despotism. When they are set at naught, free government is gone, and government by force, or despotism, takes its place. If the police are suffered to invade and raid houses and business places without warrants, they will inevitably use that as a means of extorting money. Experience shows this to be a thing not open to doubt. Indeed, it is sufficiently known among us that that is the method by which millions of dollars have been extorted annually in the city of New York, and police officials have been enabled to retire, one after another, with great wealth. Such police lawlessness is far more dangerous than all the gambling and other vices combined. It brings in its train all of the vices, and debases government and society. The voters of this city have four times in succession voted out official control of the city which permitted and sometimes encouraged such police lawlessness, and they will do it again. They have by no means lost their sense of the blessings of free government. All that most men have is their liberty, and their right to vote, and while they have the latter they do not propose to lose the former. The notion that the police, or police officials, however high, may violate the law in their efforts or pretenses to make others obey it, is a most pernicious one. What they cannot do by keeping within the law themselves, the law does not require or suffer them to do at all. It is not for them to try to be, or pretend to be, stricter or better than the law, or to resort to means which the law regards as destructive of free government, and does not permit. The law can be effectually and permanently enforced only in a lawful, orderly and uniform manner. This is a case in which it is the bounden duty of the judiciary to speak out plainly, after the manner of judges in England and here from the earliest times. In a free government, the courts are the guardians of the rights and liberties of the people.

The learned counsel for the defendant concedes that the acts complained of are an unlawful trespass, and admits that the limitations of the powers of the police are correctly laid down by this court and the Court of Appeals in the Glennon Case, 37 Misc. Rep. 1, 74 N. Y. Supp. 794; 175 N. Y. 45, 67 N. E. 125; and in the 'Summers Case, 40 Misc. Rep. 384, 82 N. Y. Supp. 297. Invoking, however, the rule of equity that a plaintiff in order to get relief must come into court with clean hands, he claims that this plaintiff's hands are not clean, for which he cites the case of Weiss v. Herlihy, 23 App. Div. 608, 49 N. Y. Supp. 81. The decision there is by a seriously divided court, and is, at best, it seems to me, unauthoritative except in a case exactly the same. So far as this case is concerned, the plaintiff's hands are clean; and, indeed, nothing is proved against him outside of it. But if he were a man of bad or inferior character, he would be entitled to the protection of the laws and the courts in his rights. The police cannot trample on people on any such ground as that. It is not for them to adjudge any man to be good or bad, but for the courts. If they claim that this plaintiff is a criminal, let them bring him into court on a warrant and prosecute him.

The motion is granted.