CITY OF DALLAS v. CLUCK & MURPHY et al. (No. 8700.)

(Court of Civil Appeals of Texas. Dallas. Oct. 29, 1921. Rehearing Denied Nov. 19, 1921.)

1. Injunction ⟊118(3)—Petition for injunction against city held to allege authority of officer.

In a suit against a city to restrain interference with sale of milk by plaintiff, a petition alleging that one who had some official connection with the health department of the city, and who was acting in an official capacity for the city, without lawful authority, issued an order prohibiting the sale, sufficiently alleges that the order was issued within the scope of the officer's authority.

2. Municipal corporations ⟊191—Answer to injunction petition held ratification of unauthorized acts of officer.

In a suit to enjoin the enforcement of an order by a city sanitarian prohibiting plaintiffs from selling milk, an answer alleging that plaintiffs had violated the city ordinance, and that the order was lawful as a warning of prosecution for such violation, ratified the issuance of the order if such act was previously unauthorized.

3. Municipal corporations ⟊191—Unauthorized order of sanitarian held within scope of duties.

The issuance of an order by the city chemist and sanitarian, who was charged with the enforcement of health ordinances, against the sale of milk alleged not to conform to regulations, which order was apparently approved by the other officers of the city, was within the scope of the officer's authority, though it was not directly authorized by the ordinance and was ultra vires.

4. Injunction ⟊77(1)—May through officers perform ultra vires acts authorizing injunction.

A city may through its officers perform ultra vires acts so as to entitle one injured thereby in a particular personal right to an injunction against the city.

5. Injunction ⟊211—Decree held not to restrain prosecutions under ordinance.

A final judgment which continued the original temporary injunction which restrain-

ed a city and its officers from interfering with plaintiffs' business of selling milk, other than as justified under a city ordinance, which may prescribe a specific penalty for its violations, did not restrain prosecutions for violations of the ordinance, though it contained general prohibition against any attempt to suspend plaintiffs from the conduct of their business, or to prevent any person from purchasing or disposing of milk produced by them.

6. Injunction ⟊105(1), 211—Criminal prosecutions cannot be restrained; decree not construed to render it invalid.

Injunctions do not issue against the enforcement of criminal law and therefore an injunction will not be construed prohibiting prosecutions for violation of city ordinance which would render it invalid if its terms are susceptible of another construction which will render it valid.

On Motion for Rehearing.

7. Equity ⟊65(3)—Violations of ordinance do not prevent injunction against arbitrary order.

A city cannot prevent the issuance of an injunction against the enforcement of an arbitrary order by its officer suspending plaintiffs' right to sell milk by showing that plaintiffs had violated the city ordinances regulating the sale of milk, and therefore did not come into court with clean hands.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Suit for injunction by Cluck & Murphy against the City of Dallas and others. Judgment for plaintiffs, and the named defendant appeals. Affirmed, and motion for rehearing overruled.

J. J. Collins, Allen Charlton, and Carl B. Callaway, all of Dallas, for appellant.

Miller, Lewis & Thornton, of Dallas, for appellees.

HAMILTON, J. This case is before us on the record and appellant's brief, no brief for appellees having been filed.

The following is appellant's statement of the nature and result of the case:

"Cluck & Murphy were engaged in operating a dairy near the city of Dallas, and they disposed of their milk to O. L. Hamilton within the city of Dallas, who distributed and resold same to the ultimate consumer.

"The city of Dallas, a municipal corporation, incorporated by special act of the Legislature, which act provides that all courts take judicial knowledge of same, passed an ordinance regulating the production of milk to be sold in the city of Dallas, and regulating the conditions surrounding the production of such milk and the purity of the milk from the time of its inception in the cow to the time of the sale to the ultimate consumer.

"The city chemist and sanitarian was C. M. Adams, and he was a city employee in the health department of the city of Dallas, and it

was his duty to enforce such milk ordinance. He believed that appellees' milk was not produced in a lawful manner, and so advised them in writing, and he also wrote to O. L. Hamilton advising him of the defective and unlawful production of such milk, and told him not to sell same in the city of Dallas. He also, through one of his subordinates, wrote appellees, in substance, that they were suspended from selling milk in the city of Dallas for two weeks.

"The appellees brought this suit to enjoin the city of Dallas and C. M. Adams from interfering with them or their business except 'as may be justified or authorized under a city ordinance.'

"The appellees predicated their right to an injunction on Adams' order to suspend business for two weeks. Under said ordinance he had no authority to issue such order, and no one had authorized him to do so, and appellees did not allege that he was authorized to do so or that he acted within the apparent scope of his authority.

"The city of Dallas contends Adams exceeded his authority in ordering appellees to suspend, and for that reason the city was not responsible for such unauthorized order, and that the city of Dallas has never desired and does not now desire to suspend the operation of the business of plaintiffs, except through prosecution and conviction, and in accordance with such milk ordinance. The city pleaded other matters, as will more fully appear.

"A temporary writ to same effect was also requested and issued. On a hearing such temporary injunction was continued in full force and effect as to any attempt upon the part of the defendants or either of them to suspend plaintiffs from the conduct of their said business or to prevent any other person from purchasing or disposing of milk produced by plaintiff for any period of time until the final disposition of this cause upon the final trial hereof. The court further overruled the general demurrer of the defendants to plaintiffs' petition below and refused to pass upon their special exceptions to said petition, to all of which the defendant excepted, and the appellant gave notice of appeal and brings this temporary injunction and the action of the lower court up for review."

Appellant's assault upon the validity of the trial court's decree is comprised in ten points, which substantially submit the following propositions: First, that a general demurrer to the petition ought to have been sustained because it did not allege that C. M. Adams acted within the scope of his authority or within the apparent scope of his authority as an agent or officer of the city of Dallas when he interfered with appellee's business; second, that the pleadings and evidence showed that Adams' only interference with appellee's business, and the threatened interference, was the order to appellees to discontinue business for a period of two weeks, which was unauthorized by the city of Dallas, was beyond the apparent scope of Adams' authority, and was not ratified by the city of Dallas, which in no way was responsible for such order;

third, that appellees' conduct in persistently violating the Dallas ordinances regulating the production and delivery of milk put them in a position to receive no relief from a court of equity, and the effect of several different points is to invoke the equity maxim that "he who comes into a court of equity must come with clean hands"; fourth, that the injunction is improper because it transcends the extent of relief sought in the petition and restrains the city of Dallas from enforcing its valid milk ordinances in the method lawfully prescribed.

[1] We do not think the general demurrer ought to have been sustained, and in our view the court committed no error in overruling it. Appellants allege that Adams "had some official connection with the health department of said city of Dallas, the exact official capacity of the said Adams in said department, or as an official of the city of Dallas, being to plaintiffs unknown." They then allege, in effect, that while they were conforming to the sanitary requirements of the city of Dallas which were imposed upon all other producers of milk, Adams, acting in an official capacity for the city of Dallas, without lawful authority issued an order alleged to be as follows:

"July 7, 1921.

"Cluck & Murphy—Dear Sir: This department wishes to inform you that a sample of your milk taken at O. L. Hamilton on 7/5/21 registered a temperature of 68–70 degrees Fahrenheit, and was therefore above the legal limit of 55 degrees Fahrenheit.

"This is the third successive sample showing that you are disregarding the requirements of the Dallas milk ordinance.

"You are therefore notified that your milk cannot be accepted for sale within the city of Dallas until such time as you have satisfied this department of your ability and intention of producing good milk. Proper arrangements can be made by calling at the office of the director of public health, room 403, city hall. Yours very truly, C. M. Adams, Sanitary Officer in Charge U. S. Public Health Service.

"You are notified that you are cut off for a period of two weeks."

It was alleged that O. L. Hamilton, to whom appellees' milk was sold, and by whom it was resold to the consumers, had received a similar order, and thereupon had refused further to comply with his contract to accept appellees' milk. The city ordinance regulating the subject of the sale and distribution of milk in Dallas was described, and it was alleged that neither it nor any other provision of law authorized the city of Dallas or Adams, acting as its officer, to issue and arbitrarily enforce the order complained of.

[2] The above secondly stated contention of appellant we hold to be untenable. We have already said that the petition could be fairly considered to allege that Adams acted within the apparent scope of his authority. The

verified answer filed by the city of Dallas may be taken as conclusive of its ratification of Adams' acts and as estopping it by admission now to deny authorization of his acts.

Appellant and Adams were represented by identical counsel and jointly pleaded their defense. Aside from exceptions leveled at the petition for injunction, the following joint defenses were made by the city and Adams: They alleged that the plaintiffs were chronic and persistent violators of the ordinance of the city of Dallas for the licensing of milk and milk product establishments, an ordinance designed to protect the health and welfare of the citizens of Dallas against impure and contaminated milk. The provisions of the ordinance were stated. It was alleged that the city of Dallas, acting through its board of health and the defendant, Adams, had determined that plaintiffs' milk products were sold to O. L. Hamilton in violation of the ordinance, and after repeated violations of the ordinance by plaintiffs Hamilton was informed that he would be prosecuted under the laws of the city of Dallas if he sold any milk produced by plaintiffs; that such warning was a legal and valid exercise of the police power; that the letter addressed to plaintiffs and signed by Adams was a mere statement to them that they had not complied with the city ordinances; that it would be unlawful for any one to accept their milk for sale in the city of Dallas, and that it would be unlawful for them to sell it in the city of Dallas until after full compliance with the ordinance; that the letter was not intended to limit the time within which plaintiffs should not sell milk in the city of Dallas, except so far as their failure to comply with the valid ordinance of the city would itself limit such right; that the expression, "You are notified that you are cut off for a period of two weeks," was inserted without Adams' authority, and without the knowledge of the board of health and the city of Dallas, and that, when this expression is construed with the whole letter, it has no meaning. It was further alleged that the city of Dallas and its officers never intended to prevent the unlawful sale of milk in the city of Dallas beyond forbidding the sale of milk below the standard required by the ordinance and by prosecuting offenders against the ordinance. The pleadings do not disclaim knowledge of or acquiescence in whatever was intended by the letter. It does nothing more by its answer than to attempt to justify and interpret the letter, giving it an effect different from that imputed to it by the plaintiffs. There is no proof indicating that the city was not participating with or acting through Adams.

[3] Adams testified that the letters sent to Hamilton and to Cluck & Murphy were sent with his knowledge and consent, although he stated that he knew absolutely nothing about their being sent at the time. He swore that the words "cut off" in the letter to plaintiffs

meant that if they sold milk they would be prosecuted in the city court. The proof shows that he occupies the office of city chemist and city sanitarian of the city of Dallas. There is nothing in the record before us suggesting that his act in sending the letters was beyond some specific authority given him by the city of Dallas. In the sense that the threatened action of cutting the plaintiffs off for two weeks was unauthorized by any ordinance of the city of Dallas, it was ultra vires, as contended by appellant. But a municipal corporation acts through its officers and representatives, just as any other corporation acts, and; so far as the record discloses, they all supported and approved what Adams did. His acts, although not in accord with the ordinance, appear to have had the approval and sanction of those who directed the policy and course of the city. In the sense, therefore, that Adams acted outside of and beyond the course of duty actually prescribed for him, this does not appear to have been the case.

[4] A municipal corporation may itself do an ultra vires act by instructions and directions through its officers and agents, or by actual or implied ratification, and it is well settled that an ultra vires act may be restrained by injunction when it would impair a particular personal right. The distinction between acts which are ultra vires and those which are not is that between acts which are within the corporate powers of the city and those which are not. High on Injunctions, vol. 2, p. 1247. Neither the city nor Adams attempts either by pleading or proof to show that the latter acted otherwise than in the discharge of official duty imposed upon him. He was at least acting within the general course of his duty when he overstepped the bounds which restrained him and invaded the rights of appellees. To say the least, it seems to us that the pleadings and the proof are sufficient to render the act complained of an unlawful or ultra vires corporate act, especially since it seems to us that the city ratified it by defending it. Dillon on Municipal Corporations (5th Ed.) vol. 4, p. 2751 et seq., and also page 2875, same volume; 22 C. J. 331; Brown v. City (Ky.) 9 S. W. 384.

Our view is adverse to appellant's position that appellees by persistently violating criminal ordinances of the city had put themselves in a position where they could not invoke the aid of a court of equity. The equity maxim, "He who comes into equity must come with clean hands," is called to the aid of appellants by their counsel, who insist that this maxim applies because appellees' unlawful conduct caused the actions about which they themselves complain. The ordinance which the city insists was flagrantly violated by appellees is a criminal one. The presumption of law must prevail in all court proceedings that those charged with infraction of criminal laws are innocent until they are adjudged guilty in a proceeding lawfully

instituted and prosecuted to final judgment, especially in the absence of admission. To sustain the position of the appellant would be to ignore and override this presumption. As we see it, the above-quoted maxim of equity can have no application. On the contrary that other equity maxim, "Equity follows the law," could be invoked, it occurs to us, with a nearer approach to propriety. Certainly equity should never undertake to nullify constitutional and valid statutory requirements.

[5] We do not think that the effect of the judgment is to restrain or interfere with prosecutions under criminal ordinances. The writ of injunction originally issued restrains the defendants from "further interfering in any way with plaintiffs in the conduct of their business, other than as may be justified or permitted under a city ordinance, which may prescribe a specific penalty for its violations. * * *"

The judgment of the court subsequently entered upon hearing of the application continues the original order in effect as the decree of the court until final disposition of the case.

It is true that the original order is continued "as to any attempt upon the part of the defendants, or either of them, to suspend plaintiffs from the conduct of their said business or to prevent any other person from purchasing or disposing of milk produced by plaintiff for any period of time until final disposition of this cause." This language, construed with that of the original order, does not plainly import a purpose to interfere with any procedure authorized by any criminal ordinance of the city of Dallas, since the original order continued in force expressly disclaimed any purpose or right to interfere with the enforcement of criminal ordinances. The manifest importance of the vigilant supervision and restriction of dispensers of milk as prescribed by valid ordinances forbids that the language of the decree should be given the effect suggested by appellant. The safety of health, even the safety of lives, of the city's inhabitants, in thousands of conceivable instances requires rigid and vigilant enforcement of the valid police provisions designed for the protection of the citizens against careless or unconscionable milk producers and distributors.

[6] Furthermore, injunctions do not issue against the enforcement of a criminal law. A court of equity transcends its jurisdiction and power whenever it attempts by injunction to interfere with criminal proceedings in a court specially clothed with jurisdiction over such action as the injunction might forbid. An injunction designed to operate to such effect would be wholly ineffectual and void. And this is true notwithstanding the court of equity already has jurisdiction of the parties and of the subject-matter concerning which the criminal action is instituted. High on Injunctions, vol. 1, § 68. Hence to give the decree the effect suggested by appellant would be to nullify it when we can uphold it under a construction just as plainly derivable from it as an entirety. We will accordingly construe the decree so as to give it a valid meaning rather than one extending beyond the confines of authority, and will say that the decree does not forbid any action authorized by ordinance; and any proceeding for contempt because of any action whatever taken against appellees in keeping with the provisions of any criminal ordinance of Dallas would be a nullity. This is a reasonable construction of the decree. It renders it valid. Any other construction would render it ineffectual and unenforceable. We will therefore overrule the appellant's contention that the injunction is illegal because it goes beyond the prayer and restrains the city of Dallas from enforcing its milk ordinance.

That a city should protect the health and lives of its people is of supreme importance. That in so doing it should act lawfully rather than arbitrarily is of equal importance.

We think the whole record can be said to support the decree as we have construed it, and it is affirmed.

### On Motion for Rehearing.

The appellant has filed an exhaustive motion for rehearing. This motion urgently presses upon us all the contentions of appellant presented in its brief and argument upon the original consideration of the case. We do not deem it necessary to add anything to what we have already said in disposing of any of the grounds of the appeal, except the contention which is rested upon the equitable maxim, "He who comes into a court of equity must come with clean hands," and that, since appellant invoked this maxim against appellees, the question of their guilt or innocence should have been considered by the trial court under the evidence tendered by appellant and excluded, the purpose of which evidence was to show that appellees had continuously and persistently violated the criminal ordinance of the city regulating the sale and distribution of milk, thus establishing their lack of good conscience in relation to the subject-matter of the suit and thereby precluding them from any right to receive relief in a court of equity.

That portion of our opinion in which we dispose of this contention on the part of appellant and sustain the action of the trial court is elaborately criticized in the motion for rehearing. The following is the language by the use of which we dispose of appellant's propositions bearing upon this feature of the case:

"Our view is adverse to appellant's position that appellees by persistently violating crim-

inal ordinances of the city had put themselves in a position where they could not invoke the aid of a court of equity. The equity maxim, 'He who comes into equity must come with clean hands,' is called to the aid of appellants by their counsel, who insist that this maxim applies because appellees' unlawful conduct caused the actions about which they themselves complain. The ordinance which the city insists was flagrantly violated by appellees is a criminal one. The presumption of law must prevail in all court proceedings that those charged with infraction of criminal laws are innocent until they are adjudged guilty in a proceeding lawfully instituted and prosecuted to final judgment, especially in the absence of admission. To sustain the position of the appellant would be to ignore and override this presumption. As we see it, the above-quoted maxim of equity can have no application. On the contrary, that other equity maxim, 'Equity follows the law,' could be invoked, it occurs to us, with a nearer approach to propriety. Certainly equity should never undertake to nullify constitutional and valid statutory requirements."

Appellant's counsel, with the appearance of utmost sincerity, contend that the necessary effect of the language thus used is to declare that proof of facts showing a violation of any criminal ordinance or criminal statute in any civil action could not be made until after a conviction in a criminal court for the violation of law involved in such facts.

[7] Without pausing to discuss whether or not this meaning could be derived, within the limits of reason, from what we have said, we nevertheless think that it must be apparent that our purpose is not to express any such view. The language was intended, of course, to apply to the situation presented in this case and to no other. And what is that situation? It is this: The city of Dallas has enacted certain criminal ordinances and prescribed certain procedure by which to secure to its inhabitants protection of health against the sale and distribution of unwholesome milk and milk products. Instead of pursuing the course laid out and prescribed in the ordinance, appellant, through Adams, in the most arbitrary manner adjudges appellees guilty of the violation of such criminal ordinance and undertakes to administer peremptory punishment not in accordance with the provisions of the ordinance or with those of any prescribed authority, but in utter disregard of the elementary tenets of criminal procedure. Without a hearing being given appellees so far as the record shows, and even without any previous notice to them, the city chemist and city sanitarian of the city of Dallas, in dictatorial and militaristic fashion, adjudges appellees guilty and imposes a penalty upon them. The penalty thus imposed is not one authorized by any law, even if guilt had been lawfully established. It is a penalty sanctioned solely by the caprice of this particular official. The effect of the order thus issued, in a practical sense, is entirely to stop the conduct of appellees' business for a period of two weeks, and, to that extent, deprive them of their property. If it cannot be said that the city of Dallas authorized all these acts and this oppressive and unlawful conduct, nevertheless it occurs to us that the conduct of the city constitutes a clear ratification of what was done by this official.

Having thus departed from the course it had prescribed to be pursued in compelling milk producers and dealers to dispense healthful products, and having resorted to a course of the most arbitrary character and a course which necessarily operates in effect to impair fundamental rights of citizens the city of Dallas now stands before a court of equity, and, in effect, says that, notwithstanding its ordinances provide for prosecution before a court where the right of trial by jury is available to those charged with infraction of the very ordinance it contends appellees violated, and thereby caused the arbitrary and unlawful conduct of appellant and its officers, and notwithstanding the further fact that one of its officials, clothed with no judicial authority whatsoever, has arbitrarily adjudged appellees guilty of violation of the ordinance, by resort to an edictal order it has undertaken to suspend the operation of appellees' business entirely for a period of two weeks, or until such time as appellees shall seek out this functionary in his quarters, and there make such arrangements as he may dictate as proper arrangements for re-engaging in their business. The edict thus issued by this official is not a notice to appellees that they will be prosecuted if they sell milk in violation of the ordinance. Most indulgently considered, it is rather a notice to the effect that the operation of appellees' business shall not be made to depend upon their actual compliance with law, but rather upon their ability to satisfy this official that during the future they will fully comply with the requirements of the ordinance. The "arrangements" required to be made are not as to what has already occurred. The notice has the necessary effect of placing upon appellees the requirement to go through whatever process may be demanded by Adams to satisfy his department with reference to appellees' future conduct as a basis of right to resume their business during any of this period. The penalty imposed deprives the appellees of the pursuit of their business for a period of two weeks, whether they might desire to offer milk for sale in compliance with the ordinance or not. There is no condition prescribed to the effect that, if they conform to the requirements of law, they may continue their business. The arbitrary fiat is that for a period of two weeks they are "cut off," regardless of whether their milk may be offered for sale and distributed in compliance with or in

violation of the ordinance during that period; in other words, this is the punishment imposed by Adams for conduct which he has determined to be in violation of law.

Such we conceive to be the acts and conduct which appellant has sought to defend and uphold. Appellant comes into court in response to the application for an injunction to restrain the further pursuit of such course and says, in effect, that, although punishment has thus been imposed upon appellees in an unauthorized manner, yet, appellant, after having circumvented appellees' right of trial as prescribed by law and after having imposed upon them a penalty depriving them of their property without due course of the law of the land, will now, in a court of equity, make proof of facts to establish the criminal guilt of appellees, and thereby put itself in a position to proceed to a final consummation of the course indicated and thus far taken by Adams.

We adhere to the view that the maxim of equity in which appellant seeks protection cannot be applied. We do not understand that this maxim must in all cases have the force of a rigid and inflexible rule, but that it may be relaxed when, in the view of a court of equity, public policy may require it to yield. The maxim, itself, is founded upon public policy, and its application must be controlled in consideration of whether or not the public policy of the state will be best conserved by applying or refusing to apply it in a given case. We think it can be safely said that public policy must always be given first consideration in determining whether or not a temporary injunction should be granted or refused in cases of this nature.

Moreover, it seems clear to us that to permit the city of Dallas to enforce its criminal ordinances by such methods as those which appear to have been resorted to in this case would be to override the constitutional provision for the right of trial by jury and the constitutional guaranty against the taking of property otherwise than by due course of law. We regard the acts complained about as indefensible, and we think that to sanction them in any court of this state would be a subversive and dangerous thing, which this court, at least, will not do in the absence of controlling authority requiring it.

Certain cases from other jurisdictions are cited by appellant to support its contention that appellees can have no relief in a court of equity under the above-quoted equity maxim. The case of Modern Horse Shoe Club v. Stewart et al., 242 Mo. 421, 146 S. W. 1157, and the case of Weiss v. Herlihy, 23 App. Div. 608, 49 N. Y. Supp. 81, are cited. Those are cases in which men engaged in conducting disorderly houses in violation of law so as to constitute public nuisances sought to enjoin arrests by officers who were seeking to break up these resorts. We do not believe these cases are analogous to the case before us, or that they ought to be considered as authority for our guidance in this case. The nature of the business interfered with in those cases is wholly distinct from the nature of the business pursued by the appellees in this case. The operations interfered with in the instance of each of those cases were in their nature criminal and permeated with turpitude. In the Missouri case supra the police were arresting persons in a club. The proprietor sought an injunction in his own behalf. As said by the court in the course of the opinion:

"It was not a proceeding instituted in behalf of individual members of the club who claimed to have suffered from illegal arrests made by the police."

The officials of St. Louis answered that, whether or not the arrests were made unlawfully, yet the place was used as a resort for prostitutes and as a harbor for criminals. The proof established these facts. In the case of Weiss v. Herlihy, supra, the injunction was sought to prevent interference with the conduct of a disorderly house in a city. Such things are per se evil. When their nature is inquired into their uncleanliness conclusively appears. On the other hand, the business of selling and dispensing milk is not in its nature bad; on the contrary, it is altogether a wholesome and indeed a necessary business. Complaint against it in any particular instance can arise only when the products sold are so infected with impurities as to endanger the health of users. But, regardless of whatever analogy to the case before us may be presented in the above-named cases, we will, nevertheless, refuse to be bound by them as conclusive upon us, and will abide by our decision, which we believe to be a just and sound one.

The motion for rehearing is overruled.