ALBRIGHT *v.* KARSTON.

4-7254                                        176 S. W. 2d 421

Opinion delivered November 15, 1943.

*John P. Vesey* and *Murphy & Wood,* for appellant.

*Owens, Ehrman & McHaney,* for appellee.

ROBINS, J. The relief sought in this case by appellee (plaintiff below) was an injunction against appellants, the superintendent and assistant superintendent of the Arkansas State Police (defendants below) to prevent them "from molesting plaintiff or his property any further." The grounds on which this relief was sought were that no proper affidavit for the search warrant under which the State Police made one search and seizure on appellee's premises was filed with the justice of the peace before the issuance of the warrant, that the justice of the peace had no power to issue the search warrant; that the members of the State Police had no authority to serve same, and, finally, that the tables, blackboards, and other articles found by appellants in appellee's "bookmaking" establishments and seized and destroyed by them were not gambling devices within the meaning of the statute. The lower court held that the members of the State Police had no authority under the law to execute a search warrant and decreed that the appellants be "permanently enjoined from seizing, destroying, or otherwise damaging plaintiff's property in the city of Hot Springs, Arkansas, known as the Kentucky Club and located at 314½ Central Avenue, or his property known as the White Front and located at 310½ Central Avenue, Hot Springs, Arkansas." The decree of the lower court also directed that appellants return to appellee a clock and radio taken by them from appellee's premises. This appeal followed.

The undisputed testimony established that appellee was carrying on in each of the places mentioned in the complaint, and for which protection by injunction was sought, what is commonly known as a "bookmaking" establishment, wherein wagers were made on horse races being run at tracks in various parts of the United States, and further that appellee was making these bets with his

customers, paying same when the customer won, and retaining the amount wagered when the customer failed to win.

Section 3355 of Pope's Digest of the Laws of Arkansas is as follows: "Hereafter it shall be unlawful to bet in this state, directly or indirectly, by selling or buying pools or otherwise, any money or other valuable thing, on any horse race of any kind whether had or run in this state or out of this state."

By § 3322 of Pope's Digest it is provided: "Every person who shall keep, conduct or operate, . . . any gambling house or place, . . . where gambling is carried on, . . . shall be deemed guilty of a felony. . . . ."

Chief Justice HILL, in the case of *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S. 899, 118 Am. St. Rep. 29, 11 Ann. Cas. 277, said: "'There is no possible excuse under the law for a poolroom—a place maintained for carrying on or facilitating betting on horse races or any other sport or game or contest or other event upon which wagers are laid—to exist in Arkansas for one minute. Its maintenance is a crime, nothing more, nothing less." It is held in the same case (headnote 2): "A turf exchange . . . wherein money is received, won and lost on horse races, where tickets for pools on horse races to be held in this state and elsewhere are bought, sold and cashed, . . . . is a nuisance at common law."

While there are decisions in which a contrary view is expressed, the weight of authority in this country supports the holding that an establishment maintained for the purpose of receiving and making bets on horse races is a gambling house, regardless of whether the act of betting on a horse race is forbidden by statute, as it is in Arkansas.

In the case of *Thrower* v. *State,* 117 Ga. 753, 45 S. E. 126, the Supreme Court of Georgia held (headnotes 4 and 5) that "betting on a horse race came within the meaning of the Code; that one who maintained a house for the purpose of such a game was guilty of keeping a gaming house,

even though betting on a horse race was not prohibited by statute and the race was run in a different state.''

The Supreme Court of Illinois, in the case of *Swigart* v. *People*, 154 Ill. 284, 40 N. E. 432, sustained a conviction of Swigart on an indictment for keeping a gaming house on proof that he maintained a betting room where ''bookmaking'' on horse races was carried on.

In re *Opinion of the Justices*, 73 N. H. 625, 63 Atl. 505, 6 Ann. Cas. 689, it was held by the Supreme Court of New Hampshire that a place where betting, ''bookmaking'' or pool selling on horse races is promoted or permitted was a common gambling place.

The Court of Appeals for the District of Columbia, in the case of *Miller* v. *United States*, 6 D. C. App. 6, held that a horse race was a game of chance within the meaning of a statute prohibiting the setting up or keeping of any kind of gambling device adapted or designed for playing any game of chance for money.

The decisions in the cases of *State* v. *Shaw*, 39 Minn. 153, 39 N. W. 305; *People* v. *Weithoff*, 51 Mich. 203, 16 N. W. 442, 47 Am. Rep. 557, and *Church* v. *State*, 151 Fla. 24, 9 So. 2d 164, all are to the effect that use of a room for the purpose of receiving and making bets on horse races constituted keeping of a gaming room or gambling house.

This court, in the case of *Fox* v. *Harrison*, 178 Ark. 1189, 13 S. W. 2d 808, held that, even in the absence of a statute specifically forbidding betting on dog races, such betting was nevertheless a violation of the law; and, in that case, we affirmed the decree of the chancery court, refusing to enjoin certain officers from interfering with the operation of the dog racing track.

The testimony showed beyond any doubt that appellee was operating a gambling house. Appellee invoked the extraordinary process of the chancery court in order that he might operate his gambling house hereafter without molestation from the State Police. A gambling house was a public nuisance at common law, and the operation of a gambling house has by statute been made a felony in

Arkansas. So, we have here a suitor who impliedly admits that he has been maintaining a public nuisance, and has been committing a felony in doing so, coming into a court of equity and asking that he be protected in his continued maintenance of this nuisance and in his continued commission of this felony. Merely to state the position of appellee is to show the inherent weakness thereof. A court of chancery is a court of conscience and can never be called into activity for the protection of an enterprise that is not only wrong in itself but made a felony by statute.

In Pomeroy's Eq. Jur., 3rd Ed. vol. 1, p. 658, the rule is stated thus: "The principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law . . . while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust. . . . ." In the same volume, at page 657, it is said: "Whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

Mr. Justice Wood, in the case of *O'Connor* v. *Patton,* 171 Ark. 626, 286 S. W. 822, said: " 'He who comes into equity must come with clean hands,' or, as it is sometimes expressed, 'He that hath committed iniquity shall not have equity.' "

The Supreme Court of Indiana, in the case of *Pittsburg, C., C. & St. L. Ry. Co.* v. *Town of Crothersville, et al.,* 159 Ind. 330, 64 N. E. 914, said: "It is a well-settled maxim that he who comes into equity must come with clean hands. Here appellant, under the facts found, seeks the aid of equity to enjoin the appellees from abating a

public nuisance maintained by it, on the ground that they have no right to abate it. To grant such relief to appellant, who is maintaining the public nuisance, would be contrary to the well-settled principles of equity. Fet. Eq., pp. 37-40; Bisp. Eq. (6th Ed.), pp. 61-63; 1 Spell. Inj. & Extr. Rem., § 26; 11 Am. & Eng. Enc. Law, (2d Ed.) pp. 162, 163; *Albertson* v. *Laughlin,* 173 Pa. 525, 34 Atl. 216, 51 Am. St. Rep. 777; *Unckles* v. *Colgate,* 148 N. Y. 529, 43 N. E. 59; *Cassady* v. *Cavenor,* 37 Iowa 300; *Central Trust Co.* v. *Wabash, St. L. & P. Ry. Co.,* (C.C.) 25 Fed. 1; *Floral Co.* v. *Bradbury,* (C.C.) 89 Fed. 393; *Board of Trade of City of Chicago* v. *O'Dell Commission Co.,* (C.C.) 115 Fed. 574. To grant appellant the relief prayed for under the facts found would be to aid it in maintaining a public nuisance—a crime under the laws of this state. It follows that, even if appellant's contention that appellees had no authority to abate said public nuisance is correct, . . . the conclusions of law are not erroneous.''

In deciding a case much like the one at bar, the appellate division of the Supreme Court of New York, in the case of *Weiss* v. *Herlihy,* 23 App. Div. 608, 49 N. Y. S. 81, said: ''But, if the rights he asserts, and for the protection of which he asks the interposition of the equitable power of the court, are in themselves essentially illegal, or a violation of the law, then his prayer will be refused. . . .''

We conclude that, once it was conceded, or shown by satisfactory proof, in the trial below that appellee was conducting a gambling house in the premises referred to in the complaint, and with respect of which he was asking the protection of the court, the chancery court was thereby deprived of power to extend to appellee the protection sought, regardless of the validity of the search warrants or the power of the state policeman to serve them.

What has been said above determines the decision that must be made by us herein, but we deem it proper to consider and dispose of the contentions made by appellee in this court and upon one of which the lower court based its decree.

The argument of appellee that the search warrant, under which the members of the State Police acted on the occasion of one of their visits to his establishment, was void because it was issued without "oath or affirmation," and that the act authorizing the issuance of the search warrant was unconstitutional because it failed to require such "oath or affirmation," has no basis in the record in this case. The search warrant was regular on its face. There was no proof that the "oath or affirmation" was not made prior to its issuance. In the absence of such proof, it must be presumed that all things essential to its validity were done before it was issued.

It is urged by appellee that the search warrant was void because the justice of the peace of Hot Springs township who issued it had no authority to do so, it being contended by appellee that by the provisions of the act (Act No. 2 of 1917) under which the municipal court of the city of Hot Springs was organized the power of justices of the peace of Garland county to issue such warrants was withdrawn.

By § 1 of art. VII of the Constitution of Arkansas it is provided: "The judicial power of the state shall be vested in the Supreme Court, in circuit courts, in county and probate courts, and in justices of the peace. The General Assembly may also vest such jurisdiction as may be deemed necessary in municipal corporation courts, . . ." In § 40 of the same article of the Constitution, wherein their powers are enumerated, justices of the peace are authorized: "To sit as examining courts and commit, discharge or recognize offenders to the court having jurisdiction, for further trial, and to bind persons to keep the peace or for good behavior; fifth, for the foregoing purposes they shall have power to issue all necessary process; . . ."

"At common law search warrants could be issued by justices of the peace." 56 C. J. 1209. By § 3327 of Pope's Digest the issuance of search warrants such as are involved herein by justices of the peace is authorized as follows: "It is hereby made and declared to be the duty and required of the judges of the Supreme Court, the

judges of the circuit courts and of the justices of the peace, on information given or on their own knowledge, or where they have reasonable ground to suspect, that they issue their warrant to some peace officer, directing in such warrant a search for such gaming tables or devices hereinbefore mentioned or referred to, and directing that, on finding any such, they shall be publicly burned by the officer executing the warrant.''

Nowhere in the act authorizing the creation of municipal courts is there any provision by which the power to issue search warrants given by this statute to the justices of the peace is expressly rescinded, nor can it be said that this is done by implication. The only change in the jurisdiction of justices of the peace in criminal matters that was made, or could be made under the Constitution, by the terms of the act authorizing creation of municipal courts, was that the justices of the peace were deprived of jurisdiction in misdemeanor cases in townships affected by the act. The jurisdiction of justices of the peace to sit as examining courts and bind over offenders in felony cases to await the action of the grand jury, and to issue all process necessary to an exercise of that jurisdiction, remained unimpaired and unchanged. The operation of a ''bookmaking'' establishment constitutes a felony and, since justices of the peace have jurisdiction to cause persons accused of a felony to be arrested and brought before them for examining trial, it follows that they have power to issue a search warrant by which devices used in the commission of felonies may be seized, that they may be used as evidence, and that they may be destroyed, if they are such as have been outlawed by statute.

It is argued by appellee that the members of the State Police had no authority to serve the search warrant involved herein, it being contended by appellee that under the provisions of § 6 of art. 3 of division 6 of chapter 44 of the Revised Statutes of 1837 search warrants may be issued only to the ''sheriff, coroner or constable.''

316

By § 7 of Act 166 of 1937 (§ 12037 of Pope's Digest) it is provided: "The Arkansas State Police shall be conservators of the peace and as such shall have the powers possessed by policemen in cities and sheriffs in counties, except that the Arkansas State Police may exercise such powers anywhere in this state. . . ." There is nothing in the Constitution of this state which prohibits the General Assembly from conferring these powers upon state policemen, and since, under the act providing for the issuance of search warrants, sheriffs were empowered to serve them, and by the quoted portion of the act creating the State Police members thereof were given the powers of sheriffs as conservators of the peace, it follows that they are authorized to execute search warrants. The forceful arguments made against the expediency and wisdom of conferring such powers on a state constabulary controlled by the Governor are not properly addressed to this court, but are matters solely for the consideration of the legislative department. The lower court was in error in holding that the members of the State Police did not have authority to serve the search warrant.

Appellee contends that the tables, blackboards and other articles which were destroyed by the state policemen were not such gambling devices as may be destroyed under the authority of a search warrant. It is argued that these articles were not such as could be used only for gambling purposes and, therefore, were not gambling devices. In the case of *Church* v. *State*, 151 Fla. 24, 9 So. 2d 164, the Supreme Court of Florida refused to quash a search warrant issued on an affidavit which described as gambling devices, seizure of which was sought, telephones and telephone equipment such as is commonly used by "bookmakers" in taking and making unlawful bets and wagers on horse races. Without reviewing the evidence, we deem it sufficient to say that the undisputed testimony showed that all of the articles owned by appellee, seized and destroyed by the officers, at the time of the seizure were being actually used by appellee in carrying on the betting operations and were for no other purposes. These articles were, therefore, gambling devices and

subject to summary destruction by the officers under the authority of the search warrant.

Appellants took from the premises of appellee a clock and radio, which apparently were not destroyed and which were, under the decree of the lower court, ordered to be returned to appellee. This was not a replevin suit. The return of these articles was not asked in the complaint. The lower court erred in directing their return.

The decree of the lower court is reversed and remanded with directions to dismiss the complaint for want of equity.

McHANEY, J., not participating.

McFADDIN, J., (concurring). I concur in the result reached in this case; that is, that the cause should be reversed and the complaint dismissed; but my reasons for concurrence are solely because of the absence of any equity in the plaintiff's complaint.

The plaintiff, Karston, was operating a gambling house under the decision of this Court in *Fox* v. *Harrison,* 178 Ark. 1189, 13 S. W. 2d 808. The State Police raided his place of business on four occasions, destroying property. If Karston conceived that the officers acted wrongfully in destroying any of his property, then his remedy was not a suit in equity for injunction, but an action at law for damages. JudgeRIDDICK, speaking for this Court in *Garland Novelty Co.* v. *State,* 71 Ark. 138, 71 S. W. 257, recognized this distinction when he said: "The owner of property thus summarily destroyed is not without a remedy if the destruction be wrongful, for, if the property be not such as is contemplated by the statute, the officer is responsible to the owner in damages." So, Karston's remedy, if he was wronged, was at law and not in equity.

Further, there is a rule of equity that he who seeks its aid must come with clean hands, and that rule closes the door to Karston in this case. In the case of *Pon* v. *Wittman,* 147 Cal. 280, 81 Pac. 984, 2 L. R. A., N. S., 683, an operator sought an injunction against police interference in a somewhat analogous case, and the Supreme Court of California in denying the right to any equitable

relief because of the clean hands doctrine, said: "His business relationships with them (the prostitutes) were such, and the success of his business was so dependent upon their maintenance there, and he is so directly benefited by their perpetuation, that the good faith of his application might well be questioned, as it might be equally questioned whether he came into court with such clean hands and clear conscience as entitled him to invoke the equitable powers of the court to interfere, by injunction, with the execution or enforcement of the criminal laws."

In *Weiss* v. *Herlihy,* 49 N. Y. S. 81, 23 App. Div. 608, in a somewhat similar case to the one at bar, the court there said: "The plaintiff is persistently and flagrantly using his premises as a disorderly house. He asked the help of the equitable power of the court practically for the purposes of permitting him to continue in that violation of the law. It is apparent that an injunction could have no other effect, and that just as soon as the inspection of the police is withdrawn, the gambling house will be reopened to the scandal and inconvenience of the neighborhood. The court of equity will not permit its process to be perverted to any such purpose." There are other authorities to the same effect. *Delaney* v. *Flood,* 183 N. Y. 323, 76 N. E. 209, 2 L. R. A., N. S., 678, 11 Am. St. Rep. 759, 5 Ann. Cas. 48; *Andrieux* v. *City of Butte,* 44 Mont. 557, 121 Pac. 291, Ann. Cas. 1913B, 712.

So, I reach the conclusion that Karston's complaint should have been dismissed for want of equity. With the question of jurisdiction settled—and that is always a primary question—all other questions in this appeal become mere *obiter dicta,* and because such matters are *dicta,* I am concurring in the result and foregoing the *dicta.*