Bobby Glenn FERGUSON and Martha Ferguson .v. STATE of Arkansas

5517                                    458 S. W. 2d 383

Opinion delivered October 12, 1970

*James L. Sloan,* for appellants.

*Joe Purcell,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. The appellants, Bobby Glenn Ferguson and his wife Martha, were charged with having burglarized the Town & Country Restaurant at Fort Smith on August 18, 1969. Both were found guilty. The jury sentenced the husband to twenty-five years imprisonment, as a habitual criminal, and the wife to two years imprisonment. The appellants urge twelve points for reversal, but inasmuch as we find a new trial to be necessary we need discuss only those assignments of error that are apt to arise again during another trial.

The most serious question in the case concerns the validity of a search warrant that was used by the city

police to search the defendants' apartment in Fort Smith, where certain incriminating articles were found. The vital question is whether the affidavit for the search warrant sufficiently established probable cause for the search. As a background for our discussion of that issue it will be necessary for us to narrate the pertinent facts in some detail.

The manager of the Town & Country Restaurant closed and locked it at about 10:30 p.m. on the evening of Sunday, March 17, 1969. A few hours later, at about 1:00 a.m., Norman Pound, a baker employed at the restaurant, arrived at the premises, unlocked the door, and went in to begin the preparation of food for the next day's business. Pound discovered that the restaurant had been entered. He called the police, who arrived promptly.

Entry had been gained by the removal of a piece of metal siding from the outside of the building and the removal of a plywood panel from the inside of the wall. In the restaurant an upright safe had been partly opened, when, it may be surmised, the burglar or burglars had been frightened away. A sufficient opening had been made in the safe to expose a layer of asbestos and cement filling, fine particles of which were scattered about the floor. Among the burglary tools still at the scene were a sledge hammer, a smaller hammer, a long-shank punch, a crescent wrench, a Samsonite suitcase containing other tools, and a half-inch electric drill, Skil brand, bearing serial number 624092. It was not shown at the trial that any fingerprints were found.

The officers checked the cars in the vicinity. At a nearby motel, within sight of the restaurant, they found a Chevrolet El Camino parked in a breezeway. According to the proprietor of the motel, the El Camino did not belong to anyone registered there.

An El Camino is a two-door, one-seated vehicle, designed to be used both as a passenger car and a pick-up truck. The windows of the El Camino were

down. Simply by looking into the vehicle the officers observed two electric drills and two pairs of gloves, on the floor. The gloves, upon being shaken, appeared to have on them a substance similar to the asbestos or cement material that came from the safe. That material is flaky and tends to cling to clothing.

Upon leaving the premises the officers left one of their number to watch the El Camino (which proved to be registered in the name of the defendant Ferguson's mother or mother-in-law). At about 2:30 a.m. the Fergusons drove up to the motel in a Cadillac car. Mrs. Ferguson got into the El Camino, and the two vehicles drove away.

The police, notified by the officer who was watching, stopped the two cars within a few blocks. The Fergusons gave the same version of their activities that they seem to have adhered to ever since. They were living temporarily at the Mumey Apartments in Fort Smith while they were buying a house in the city. They had been living at Jacksonville, Arkansas. On the preceding night they had driven to Jacksonville, spent the night in their home there, and packed up some of their belongings, which they took to their apartment in Fort Smith.

During their absence they had left the El Camino with a man named David Williams, who was staying at the Town & Country Motel and who was going to make some repairs at the house which the Fergusons were buying. When the Fergusons returned from Jacksonville to their apartment early in the morning, they decided that Mrs. Ferguson would need the El Camino to use in going to work the next morning. That, in substance, was their explanation of their activities immediately preceding their return to the motel.

When the officers stopped the two cars and questioned the couple, Ferguson said that he owned one of the drills in the El Camino, but he did not own the other drill or the gloves. Ferguson, driving the El

Camino, was taken to police headquarters and questioned for a short time, after which he was released.

When Ferguson was taken to headquarters Mrs. Ferguson started back to the apartment in the Cadillac. Officer Adams followed her to the Mumey Apartments, where another officer was already waiting, having gone there in response to a request radioed by Officer Adams. The two officers entered the apartment with Mrs. Ferguson, who denied at the trial that she voluntarily invited them in. The officers looked around the apartment for a minute or two, satisfying themselves that no accomplice was present. They saw a number of tools in the apartment, including some drills and a keyhole saw.

According to Mrs. Ferguson's testimony at the trial, when her husband returned a short time later from police headquarters, the two of them went down to examine the El Camino more carefully. In a compartment behind the seat, not readily visible, they found an empty box with a slip of paper in it. They took the box up to the apartment and left it on a bureau.

Before noon on that same day the police arrested both the Fergusons upon the charge of burglary. At some time they examined the Fergusons' hair, eyebrows, clothing, and shoes for particles similar to those that came from the safe, but nothing was found. It is not certain from the record whether those examinations were made when the Fergusons were first stopped on the street or after their arrest.

At about five o'clock that afternoon Officer Brooks, in company with a deputy prosecuting attorney, applied to the municipal judge in Fort Smith for a search warrant to search the Fergusons' apartment. We quote the affidavit in full:

## AFFIDAVIT

At approximately 1:00 A.M., Monday, August 18,

1969, Mr. Harold Adams, an employee, entered the Town & Country Restaurant, and found that there had been an attempt to break into the safe in the office. The metal covering on the door had been peeled back, some of the asbestos filling had been stripped away. There was a large suitcase and burglar tools present: to wit, 1, ½ inch electric drill, numerous drill bits, a sawed-off sledge hammer (etc). The point of entry to the building was in the rear of the building at the Northwest corner. Mr. Adams didn't see anyone. Police arrived and searched the immediate scene and didn't find anyone. Police found a 1968 Chevrolet El Camino, Maroon color, 69 Ark. ABC617, parked on the south side of the Town & Country Motel in direct view of the point of entry, about 100 yards away, in the breezeway. Two electric drills were observed inside the El Camino and also two pair of gloves. It was then placed under police surveillance. At approximately 2:45 A.M., a 1967 Bronze Cadillac, 69 Oklahoma ZF4514, with two occupants, Bob Ferguson and Martha Ferguson, drove up. Martha got into the El Camino and turned north on Towson following Bob Ferguson in the Cadillac. Detectives Armstrong and Brooks stopped the Cadillac. Mr. Ferguson admitted ownership of one (1) of the drills, but denied that the other drill and gloves were his. Ferguson explained that he and his wife had gone out of town at approximately 1:00 A.M., Sunday, August 17, 1969, to Jacksonville, Ark., and had parked the El Camino a' Town & Country Motel because he didn't have room to park it at his residence. Monday, August 18, 1969, Armstrong and Brooks questioned Milow _____, the custodian, employed at the Town & Country Motel and he stated that he saw Mr. and Mrs. Ferguson in the bronze Cadillac at the Town & Country Motel, Sunday afternoon at approximately 1:00 P.M., August 17, 1969. At approximately 11:00 A.M., Mr. Ferguson was arrested at his residence at 405 South 14th Street—Apt. 5, and brought to the Police Department where he was booked for investigation of

Burglary. At the crime scene a large amount of asbestos filling which is insulation material contained in the safe, was found on the floor of the office. This substance had a tendency to cling to clothes, shoes, etc. A substance similar to this in appearance was found on the gloves that were found in the El Camino.

WHEREFORE, the affiant has reasonable grounds for believing that Mr. Ferguson was involved in the burglary of the Town & Country Restaurant and that his clothing and shoes will contain particles of this asbestos filling and that that clothing and shoes are now concealed at apartment No. 5, 405 South 14th Street.

/s/ *Det Eddie Brooks*

On the basis of the foregoing affidavit the municipal judge issued a search warrant. In the warrant the articles to be seized were described as "Burglar's tools, clothing and shoes which were used in the burglary of Town and Country Restaurant on August 18, 1969," though in fact the affidavit contains nothing to indicate the affiant's belief that burglar's tools would be found at the apartment.

Pursuant to the warrant the Fergusons' apartment was searched. The principal articles found, which were introduced at the trial over the defendants' objection, were an empty box on which there was printing that showed that the box had contained a Skil brand drill with the identical serial number as that on the drill found at the scene of the burglary; also a sales slip for a long-shank punch similar to the one found at the scene. At the trial a salesman at the store where the sales slip originated testified that he thought he had sold such a punch to Ferguson, but he was unable to identify Ferguson with certainty. In the search at the apartment the officers did not find any clothing or shoes having dust particles similar to those that came from the burglarized premises.

Recent decisions of the United States Supreme Court have placed comparatively strict limitations upon the power of a magistrate to issue a search warrant. In *Aguilar* v. *Texas,* 378 U. S. 108 (1964), the court held that the affidavit for a search warrant must contain affirmative allegations of fact from which the magistrate may independently decide for himself whether there is probable cause for the search. Affirmations of mere suspicion or belief, without adequate supporting facts, are insufficient. More recently, in *Spinelli* v. *United States,* 393 U. S. 410 (1969), the court interpreted an affidavit strictly by disregarding statements of fact that were open to an innocent interpretation as well as to an incriminating one. There, for instance, the court gave no weight whatever to the fact that a suspected bookmaker's place of operation had two telephones, because "[m]any a householder indulges himself in this petty luxury."

When we apply the Supreme Court's reasoning to the affidavit in the case at bar, we are unable to say that the officer's assertion of probable cause for the search rested upon anything more than suspicion. We disregard the fact that the search warrant authorized a search for burglary tools, because the affidavit was not drafted with a view to such a search and actually set forth no facts tending to indicate that the Fergusons had such tools in their apartment.

There remains the asserted belief of the affiant, Officer Brooks, that Ferguson's "clothing and shoes will contain particles of this asbestos filling and that that clothing and shoes are now concealed at" the Fergusons' apartment. In weighing the facts contained in the affidavit, we think it essential to consider them along with other facts which, according to the evidence adduced at the hearing upon the motion to suppress the State's evidence, were known to the affiant when he signed the affidavit. Any other rule would encourage overzealous officers to conceal known facts in an effort to persuade the magistrate to issue the requested search warrant.

According to the proof in the record, the officers were alert from the outset to the possibility that incriminating dust from the safe might implicate the Fergusons. Officer Brooks, who made the affidavit, testified that when he first saw the Fergusons after their cars were stopped by the officers, and again at the police station, he checked their clothing, hair, eyebrows, and shoes for telltale dust, but he found nothing. Moreover, the officers apparently examined both the Ferguson cars during their investigation, yet there is no suggestion that incriminating dust was found in either vehicle. Finally, it is not without significance that the affiant's suspicion proved to be wholly unfounded, in that no traces of the dust were found upon the Fergusons' clothes or shoes as a result of the search.

It is our conclusion that the meager facts recited in the affidavit for the search warrant gave rise at best to a suspicion—perhaps, more accurately, a hope—on the part of the affiant that the search would turn up dust particles such as the officers had been unable to find in more likely places. Mere suspicion, however, cannot take the place of "facts and circumstances . . . such as to warrant a man of prudence and caution in believing" that there was probable cause for the search. *Dumbra v. United States*, 268 U. S. 435 (1925). For these reasons the trial court should have granted the defendants' motion to suppress the evidence disclosed by the search; namely, the box that had contained the Skil drill, serial number 624092, and the sales slip.

The other points for reversal do not call for extended discussion. We agree with the appellants' contention that the court erred in giving in its instructions a definition of "alibi" that required the jury not only to find that the defendants were not present when the crime was committed but also that they were without "knowledge or connection with the offense." The quoted phrase was repeated in substance five times in the instruction. The instruction was fatally defective in that it would have allowed the jury to reach a finding of guilty if they found that the defendants had innocent

knowledge of the offense, even though they did not participate in it.

On the other hand, we see no error in the court's having given an instruction defining principals and accessories. It was the State's theory that the Fergusons had participated jointly in the crime, but there was no direct evidence to show what part either one may have played. Hence the jury were properly told in substance that one who aids and abets another in the commission of an offense is also guilty as a principal.

Finally, the appellant Bobby Glenn Ferguson argues three points with respect to the habitual criminal statute. First, the constitutionality of such statutes is questioned, but it is enough to point out that their validity has long been sustained. Wharton's Criminal Law and Procedure, § 2218 (Anderson's Ed., 1957).

Secondly, it is insisted that the proof of Ferguson's prior convictions was defective in that the certified copies merely identified him by name, as Bobby Glenn Ferguson or Bobby Ferguson. That argument was rejected in *Higgins* v. *State*, 235 Ark. 153, 357 S. W. 2d 499 (1962). Thirdly, we find no merit in the appellants' argument that the jury must have known that one or the other of the defendants had previously been convicted of some offense, simply because the verdict forms that were first submitted required the jury to make a finding of guilt or innocence without also fixing the punishment. Counsel do not suggest how the matter could have been handled with any greater fairness toward the defendants, nor is any authority cited to show that the trial court's procedure was subject to criticism. We find no semblance of error in the court's selection of the verdict forms.

Reversed and remanded for a new trial.

HARRIS, C. J., and FOGLEMAN, J., concur.

CARLETON HARRIS, Chief Justice, concurring. I agree

that this case should be reversed because of the erroneous instruction relating to an alibi, but I do not agree with the majority that the affidavit of Officer Brooks was defective in that it did not set forth sufficient facts to enable the magistrate to independently determine that there was probable cause for the issuance of the search warrant. The affidavit and surrounding circumstances are set forth in the majority opinion, and I see no point in commenting further. To me, the grounds set forth in the affidavit were ample to justify the magistrate in issuing the warrant, and I therefore respectfully dissent.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result reached by the majority but do not agree upon the basis on which that result should be reached. In my opinion the affidavit states a reasonable ground for belief that clothing and shoes in Ferguson's apartment would contain telltale particles of the asbestos filling from the "peeled" safe. It appears to me, however, that the search warrant was fatally defective in that there is no authority for the issuance of such a search warrant, however desirable it might be that magistrates be vested with that authority.

According to the testimony of the municipal judge who issued the search warrant, the affidavit reproduced in the majority opinion was the sole basis for its issuance. This affidavit nowhere mentions any belief that there were burglar tools or other contraband in the place to be searched or that there were any other articles for which a search warrant might be issued either under statutory or common law authority. I agree with the appellants that there must be such authority before any judicial officer has the power to issue a search warrant. *Gouled* v. *U. S.*, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647 (1921); *White* v. *Wagar*, 185 Ill. 195, 57 N. E. 26 (1900); *Sugarman* v. *State*, 173 Md. 52, 195 A. 324 (1937). See also, 79 C. J. S. 827, Searches and Seizures, § 64; 47 Am. Jur. 511, Searches and Seizures, § 14; 1 Varon, Searches, Seizures and Immunities 371; 4 Wharton's Criminal Law and Procedure, Anderson 173 § 1548.

It is clear that there is common law authority for the issuance of a search warrant for burglary tools, stolen or forfeited property, any property which it is unlawful to possess, weapons or instrumentalities of crime and other articles of such nature and character. See *Boyd* v. *U. S.*, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886); *Weeks* v. *U. S.*, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B 834, Ann. Cas. 1915C 1177 (1914).

I do not think that the case of *Warden* v. *Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967), relied upon by the state, overruled *Gouled* in its holding that there is no common law authority for issuance of a warrant to search for "mere evidence." In *Warden*, the search was made contemporaneously with a lawful arrest upon hot pursuit. The incriminating evidentiary material was found and seized by the officers in the course of a proper search of the premises for the person or persons to be arrested, for weapons and instrumentalities or fruits of the crime. The only effect of *Warden* upon this situation, in my opinion, is the holding that there are no federal constitutional inhibitions against the seizure of mere evidence. There is no indication in that case that there is authority for the issuance of such a warrant, without common law or statutory authority.

I have been unable to find any statute that authorizes the issuance of a warrant to search for Ferguson's clothing and shoes. I do not believe that they can be considered instrumentalities of the crime.

It is suggested that we found inherent authority for justices of the peace and municipal judges to issue search warrants for anything for which a search is constitutionally permissible in *Albright* v. *Karston*, 206 Ark. 307, 176 S. W. 2d 421. I do not agree with this argument. In the first place, the authority of the municipal judge to issue a properly authorized warrant was based upon the common law authority of justices of the peace to issue warrants. The power of justices of the

peace to issue the warrants in that case was related to statutory authority for the issuance of warrants to search for gaming devices and authorizing the destruction of such devices. According to the majority opinion, the undisputed testimony showed that all of the articles seized were being actually used in carrying on gambling operations, and for no other purpose. The argument that authority is inherent and limited only by constitutional restrictions is hinged upon the following language in that opinion:

> * * * The operation of a "bookmaking" establishment constitutes a felony and, since justices of the peace have jurisdiction to cause persons accused of a felony to be arrested and brought before them for examining trial, it follows that they have power to issue a search warrant by which devices used in the commission of felonies may be seized, that they may be used as evidence, and that they may be destroyed, if they are such as have been outlawed by statute.

I submit that, even if this language is not dictum, it is applicable only when power is vested in justices of the peace at common law or by statute to issue search warrants for instrumentalities used in the commission of felonies and nothing further.

I agree with all other matters covered in the majority opinion except for certain language with reference to consideration of lack of success of the search as a significant factor in determination of the validity of the warrant and consideration of the failure of the officers to find incriminating dust on the clothing of the Fergusons before the affidavit was made.

The validity of the warrant should be determined upon the basis of the evidence produced before the magistrate issuing it. Success of a search will not validate a warrant. *Walton and Fuller* v. *State*, 245 Ark. 84, 431 S. W. 2d 462. Failure should not be evidence of invalidity. This premise is recognized in *United States* v. *Cunningham*, 424 F. 2d 942 (D. C. Ct. App. 1970).

The significance of the failure of the officer to disclose that he and others had failed to find evidence of incriminating dust on the persons and clothing of the Fergusons completely eludes me. I cannot see how the officer can be said to have been concealing anything. It might be different if the Fergusons had been apprehended upon the burglarized premises and there inspected. It must be remembered that they were not seen at the neighboring motel until 1½ hours after the burglary had been discovered. They would have had ample time to go to their residence, bathe and change clothes before they dared to try to rescue the El Camino, if they had been active participants in the safe peeling. I find no indication of any lack of good faith or withholding of information from the magistrate by the officers.

I find the language of Mr. Justice Goldberg in *United States* v. *Ventresca*, 380 U. S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), to be appropriate:

> * * * the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.