MICHAEL E. MORRIS v. STATE OF ARKANSAS

5674                                     479 S.W. 2d 860

Opinion delivered May 8, 1972

*Jack Holt Jr.* and *Jack Sims,* for appellant.

*Ray Thornton,* Atty. Gen., by: *John D. Bridgforth,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Charged with the unlawful possession of LSD, a hallucinogenic drug, the appellant was found guilty and sentenced to a $250 fine and to 12 months imprisonment. His principal contention for reversal is that the trial court erred in refusing to suppress evidence obtained by means of a search warrant assertedly issued without lawful authority.

That contention must be sustained. The search warrant in question, issued' by a municipal judge, directed officers to search the appellant's apartment for LSD, marihuana, and other specified drugs. Under the authority of that warrant the police entered the apartment and seized certain drugs, which were received in evidence at the trial. In the recent case of *Grimmett* v. *State,* 251 Ark. 270-A, 476 S.W. 2d 217 (1972), which was decided after the present case was tried, we held on rehearing that at the time the search warrant in the *Grimmett* case was issued, there was neither common law nor statutory authority for the issuance of a search warrant for contraband drugs. The search warrant in that case, as in the case at bar, was issued before the effective date of Act 123 of 1971. Ark. Stat. Ann. § 43-205 (Supp. 1971). Under the *Grimmett* opinion, which is controlling here, the trial court erred in refusing to suppress the evidence obtained by means of the search warrant.

We find no other reversible error. The defendant's requested instruction upon the State's burden of proof was fairly covered by the court's instruction upon that subject. We need not pass upon the sufficiency of the evidence, for the State's proof will necessarily be different if the case is retried. There is no reason to think that other asserted errors will recur upon a new trial.

Reversed.

HOLT, J., not participating. Special Justice J. S. BROOKS joins in the majority opinion.

HARRIS, C. J., and FOGLEMAN and JONES, JJ., dissent.

CARLETON HARRIS, Justice, dissenting. Along with the other two who are dissenting in this case, I concurred in the case of *Grimmett* v. *State,* 251 Ark. 270-A (substituted opinion on rehearing February 21, 1972) 476 S.W. 2d 217. Like these two justices, I did not feel that the constitutional question should have been reached, and I certainly do not feel that that case is controlling in the instant appeal. Grimmett, as a doctor, had a right to

have drugs in his possession, and it was only because of a violation of regulations that he became embroiled with the law, *viz*, the dispensing of such drugs contrary to law, and the failure to keep proper records. Here, Morris had no such right; drugs in his possession were clearly contraband.

The majority opinion in this case is predicated on the fact that they find there was no statutory authority, or common law authority, to obtain the search warrant. Ark. Stat. Ann. § 82-2109 (Supp. 1971) provides that any officer or employee of the State Health Department designated by the State Health Officer to conduct examinations, investigations relating to depressant or stimulant drugs may, when authorized by the State Health Officer, *inter alia*, execute and serve search warrants. In *Grimmett*, the court majority stated that the literal language of the statute did not authorize the issuance of a search warrant; that strict construction was required when a statute was at variance with the common law, and accordingly there was no authority to issue the warrant. This was a part of my reason for concurring in *Grimmett*, and I consider the holding to be highly technical—too technical. The chapter (§§ 82-2101 through 82-2109) is entitled "Arkansas Drug Abuse Control Act", and was passed in 1967. The purpose of the Act undoubtedly was control of the sale, distribution, manufacture, and possession of depressant and stimulant drugs and counterfeit drugs. The authority in § 82-2109 was necessary to enforcement of the provisions of the Act. The exact language in the point under discussion is "Execute and serve search warrants and arrest warrants". Webster's Third New International Dictionary defines the word "Execute" as "To put into effect; carry out fully and completely*** perform what is required to give validity to". It is obvious to me that the word "execute" is used in the sense of denoting acts necessary before serving a search warrant, *viz*, execution of an affidavit and obtaining the warrant. Why would the General Assembly have authorized these officers to serve search warrants, but not to obtain them? This would not only be ridiculous—but a totally futile gesture, for it is certain that a warrant cannot be served until it is issued. In my opinion the language is a clear authorization for the issuance and

service of the search warrant. Under the technical construction in *Grimmett,* the majority might well also say that § 82-2109 only authorizes officers or employees of the State Health Department to perform the enumerated acts, but certainly, in my view, if employees of the State Health Department are authorized to obtain and serve search warrants, general law enforcement officers, whose primary business is to enforce the law, would have the same right.

I respectfully dissent.

JOHN A. FOGLEMAN, Justice, dissenting. This case presents another of the myriad questions which have arisen pertaining to searches and seizures as a result of the exclusionary rule foretold in *Clubb* v. *State,* 230 Ark. 688, 326 S.W. 2d 816 and made applicable to the states in *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 84 A.L.R. 2d 933 (1961). Precedent governing these questions is sparse, simply because they were not important when the evidence would not be excluded. I have long been of the opinion that there must be either statutory or common law authority for the issuance of a search warrant, in order to sustain a search and seizure against direct attack. See concurring opinion, *Ferguson* v. *State,* 249 Ark. 138, 148, 458 S.W. 2d 383. I do not believe that the decision in *Grimmett* v. *State,* 251 Ark. 270A (on rehearing Feb. 21, 1972), 476 S.W. 2d 217 reached the correct result. I have already indicated that I do not feel that it is binding as precedent, because the question decided should not have been reached, there having been a non-constitutional ground upon which the decision should have rested. See concurring opinion *Grimmett* v. *State,* supra. As I read *Grimmett,* the court held that any search and seizure based upon a warrant for which there was not specific statutory or common law authority was constitutionally unreasonable and that there was no such authority to search for substances coming within the prohibitions of the Arkansas Drug Abuse Control Act. My first disagreement with the majority in *Grimmett* is in the holding that an unauthorized search is constitutionally unreasonable. I agree with the Supreme Court of the United States, per Black, J., that a search authorized by state law may be

constitutionally unreasonable and one not authorized by state law may be constitutionally reasonable. *Cooper* v. *California,* 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788 (1967). *Grimmett* could have and should have been decided upon the simple question whether there was any authority for the issuance of the search warrants.

My next disagreement with the majority holding in *Grimmett* is its unwarranted limitation of the concept of the common law. Actually, the majority there made no exploration of the common law for authority at all. The opinion is based upon the nonexistence of any authorizing statute within the purview of our adoption of British statutes of a general nature. See Ark. Stat. Ann. § 1-101; *Smith* v. *Smith,* 219 Ark. 304, 241 S.W. 2d 113. Our adoption of the decisional common law was not limited to that existing on the date specified in the limitation on statutes. Our adopting statute was passed December 6, 1837. See *Moore* v. *Sharpe,* 91 Ark. 407, 121 S.W. 341, 23 L.R.A. (n.s.) 937; *Small* v. *Strong,* 2 Ark. 198. Although we adopted the common law of England, we have recognized that there are many sources upon which we base our determination of that law, among which are cases from other American jurisdictions. *State* v. *Phillips Petroleum Co.,* 212 Ark. 530, 206 S.W. 2d 771.

To illustrate the wider breadth of the common law, we followed the common law rule that it is clearly the duty of a railroad company to give notice of the approach of trains at all points of known or reasonably apprehended danger in *Missouri Pacific R. R. Co.* v. *McKinney,* 189 Ark. 69, 71 S. W. 2d 180. Certainly there were no English statutes or decisions on this subject in 1607. We have held that in construing a statute, we will take into account the common law in force at the time it was passed. *State* v. *Pierson,* 44 Ark. 265.

The cited cases are illustrative of the general rule as to the scope of the common law. Statements in the texts appropriately identify the common law. In 15A C.J.S., Common Law, pp. 42, 43, 45, & 52 are found the following appropriate comments:

The common law in the several states consists of the common or unwritten law of England as it existed in 1607, when the colonists from England settled in America, or in some states at a later date, in so far as that law is applicable to the new surroundings and conditions and has not been abrofated by statute, and as it has been applied and modified by the courts of this country up to the time it became a rule of decision in the states. (Sec. 1c)

The common law is one of the forms of law, and is the embodiment of principles and rules inspired by natural reason, an innate sense of justice, and the dictates of convenience, and voluntarily adopted by men for their government in social relations. The authority of its rules does not depend on positive legislative enactment, as discussed supra, but on general reception and usage, and the tendency of the rules to accomplish the ends of justice. However, except where altered by statute, it is just as much a part of the local jurisprudence as are enactments of the legislature, and where a principle of such law has entered into our form of government, it is controlling, until by legislation express in its terms it is modified or negatived by the substitution of a new declaration on the subject. (Sec. 2)

The principles of the common law are developed by, and stated in, the decisions of the courts, subsequent declarations merely adding certainty to the first statement. Thus, the common law is said after all to be but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals with respect to private disputes. (Sec. 2)

As used in state statutes adopting the common law, the expression "common law of England" has been construed to mean the common law as declared by the courts of the different states of the United States, and not solely the law as declared

by the courts of England. On the other hand, it has been held that this expression, as used in the statute, designates the English common law as interpreted as well in the English courts as in the courts of such of the states of the Union as have adopted the English common law. (Sec. 11b)

The following excerpts are taken from 15 Am. Jur. 2d, Common Law pp. 793, 795, 801:

The common law, as frequently defined, includes those principles, usages, and rules of action applicable to the government and security of persons and property which do not rest for their authority upon any express or positive statute or other written declaration, but upon statements of principles found in the decisions of the courts. As distinguished from statutory or written law, it embraces that great body of unwritten law founded upon general custom, usage, or common consent, and based upon natural justice or reason. It may otherwise be defined as custom long acquiesced in or sanctioned by immemorial usage and judicial decision. (Sec. 1)

In its broadest aspect the common law may be said to be the general Anglo-American system of legal concepts and the traditional technique which forms the basis of the law of the states which have adopted it. (Sec. 1)

The common law of England, in its broadest significance, is the basic component of the common law as adopted by American courts. But the judicial decisions of the courts of England are not deemed to be a part of the common law, but merely expositions thereof. Hence, the courts of this country, in order to ascertain the principles and rules of the common law, may look to the decisions of other states of the Union, as well as to those of the English courts. (Sec. 6)

In 1 Bouvier's Institutes 50, Title IX, Chapter II, Sec 1, Par. 121 (1858), we read:

> The common law is a system of rules which have been used by the universal consent and immemorial practice of the people, without receiving the express authority of the legislative power. It is derived principally from two sources, the common law of England, and the practice and decisions of our own courts. No general rule has been adopted to ascertain what part of the English common law is valid and binding. To run the line of distinction is a subject of embarrassment to the courts, and the want of it a great perplexity to the student.

> Customs from a part of the common law. A custom is a usage which has acquired the force of law. It derives its binding authority from the tacit consent of the legislature and the people; it follows, therefore, that there can be no custom in relation to a matter regulated by statute. Law cannot be established or abrogated, except by the sovereign will; but this will may be expressed, or implied or presumed, and whether it manifests itself by words or by acts is of little consequence.

> To make a good custom, it must be public, peaceable, uniform, general, continued, reasonable and certain, and it must have continued for a "time whereof the memory of man runneth not to the contrary." It then acquires the force of law.

It still seems clear to me that there is common law authority for the issuance of search warrants for burglary tools, stolen or forfeited property, any property which it is unlawful to possess, weapons or instrumentalities of crime and articles of such nature and character. See my concurring opinion in *Ferguson* v. *State*, supra. In support of this position, I quote from *Gouled* v. *United States*, 255 U.S. 298, 41 S. Ct. 261, 65 L.Ed. 647 (1921):

˙All of this is abundantly recognized in the opinions of the Boyd Case, 116 U.S. 616, 29 L. ed. 746, 6 Sup. Ct. Rep. 524, and the Weeks Case, 232 U.S. 383, 58 L. ed. 652, L.R.A. 1915B, 834, 34 Sup. Ct. Rep. 341, Ann. Cas. 1915C, 1177, in which it is pointed out that, at the time the Constitution was adopted, stolen or forfeited property, or property liable to duties, and concealed to avoid payment of them, excisable articles, and books required by law to be kept with respect to them, counterfeit coin, burglars' tools and weapons, implements of gambling, "and many other things of like character," might be searched for in home or office, and, if found, might be seized, under search warrants lawfully applied for, issued, and executed.

Although search warrants have thus been used in many cases ever since the adoption of the Constitution, and although their use has been extended from time to time to meet new cases within the old rules, nevertheless it is clear that, at common law and as the result of the Boyd and Weeks Cases, supra, they may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding, but that they may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful, and provides that it may be taken. Boyd Case, 116 U.S. 623, 29 L. ed. 746, 6 Sup. Ct. Rep. 524.

There is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized, and if they be adequately described in the affidavit and warrant. Stolen or forged papers have been so seized. (*Langdon* v. *People,* 133 Ill. 382, 24 N.E. 874), and lot-

tery tickets, under a statute prohibiting their possession with intent to sell them (*Com.* v. *Dana,* 2 Met. 329), and we cannot doubt that contracts may be so used as instruments or agencies for perpetrating frauds upon the government as to give the public an interest in them which would justify the search for and seizure of them, under a properly issued search warrant, for the purpose of preventing fur ther frauds.

Basing its decision upon the recognition in *Gouled* that property held for committing crime is the valid object of a properly issued search warrant, because of the public's interest in prevention and detection of crime, the Court of Appeals of Kentucky held that articles used to further acts of prostitution were proper subjects of a search warrant over the objections that they were merely evidential, and thus not properly subject to search and seizure. *Schweinefuss* v. *Commonwealth,* 395 S.W. 2d 370 (Ky. 1965).

In *People* v. *Thayer,* 63 Cal. 2d 635, 47 Cal. Rpt. 780, 408 P. 2d 108 (1965), cert. denied 384 U.S. 908, 86 S. Ct. 1342, 16 L.Ed. 2d 361 (1966), the California Supreme Court (in an opinion by Chief Justice Traynor) pointed out that *Gouled* recognized that instruments used in the commission of crime may be seized because of the public's interest in preventing their use in subsequent crimes. There is also a tacit recognition there that contraband and the fruits of crime may be seized.[1] In *Thayer,* the records of a physician used in drawing up fraudulent medical case claims which were submitted to the Bureau of Public Assistance were seized.

In *U. S.* v. *Thomson,* 113 F. 2d 643, 129 A.L.R. 1291 (7th Cir. 1940), on the authority of *Gouled,* it was held that the test of validity was not the nature of the property seized but whether it was used in perpetrating a crime.

---

[1]As to this recognition, see *People* v. *Potter,* 240 Cal. App. 2d 621, 49 Cal. Rptr. 892 (1966), cert. denied 388 U.S. 924, 87 S. Ct. 2118, 18 L. Ed. 2d 1374 (1967)

In our own case of *Albright* v. *Karston,* 206 Ark. 307, 176 S.W. 2d 421, discussed in my opinion in *Ferguson,* the language quoted, whether dictum or not is suggestive, not of authority to issue search warrants for anything for which a search is constitutionally permissible, but of authority of magistrates to issue search warrants for devices used in the commission of crimes and for things which are subject to seizure by the state.

It is said that the use of search warrants, totally unknown to the original common law, crept into the common law as basis for searching for stolen goods by imperceptible practice. *Entick* v. *Carrington,* 19 How. St. Tr. 1030, 96 Eng. Rep. 807 (1765). This is the manner in which all common law developed. That practice, i.e., search warrants for stolen goods, was developed upon the basis of the interest of the owner in the property to be seized. Our authorities show that the practice as to contraband (those things which it is illegal to possess) and instrumentalities of crime developed for the interest of the government in the property to be seized.

Examination of the Arkansas Drug Abuse Control Act, then in effect clearly makes the material seized under the warrant here both contraband and the instrumentality of a crime. The possessing of the material was a prohibited act. Ark. Stat. Ann. §§ 82-2103 (c), 82-2107 (c) (Supp. 1971). It was by the Act declared contraband and subject to seizure and forfeiture, Ark. Stat. Ann. § 82-2105 (Supp. 1971). It was the duty of the prosecuting attorney to cause "appropriate proceedings" to be instituted in the proper courts upon report of a violation without delay, Ark. Stat. Ann. § 82-2106 (Supp. 1971). Officers and employees of the State Health Department, upon designation and authorization of the State Health Officer, were empowered to execute and serve search warrants, arrest warrants, and seizure process. Ark. Stat. Ann. § 82-2109 (Supp. 1971)

In view of the statutory language and the evidence of existing common law, it seems to me to be contrary to reason to say that a proper judicial officer had no authority to issue a search warrant in this case.

I would affirm the judgment.

J. FRED JONES, Justice, dissenting. I do not agree with the majority opinion in this case. I agree that we have no search warrant statute in Arkansas directed specifically to the possession of LSD, but I am of the opinion such statute was not necessary to the validity of search and seizure conducted in this case. It is true that after more than 100 years in the recent case of *Grimmett* v. *State,* 251 Ark. 270A, 476 S.W. 2d 217, we said: "Thus we must conclude that there is no common law authority in this State for the issuance of a search warrant for contraband." I consider this statement as obiter dictum in *Grimmett* v. *State,* and I consider it inapplicable to the case at bar even if it were not dictum. The factual distinction between this case and *Grimmett* was the reason I joined the concurrence in *Grimmett.*

As I interpret the effect of the majority opinion in the case at bar, based as it is on *Grimmett, supra,* now after more than 100 years of legal history in Arkansas, we conclude that all searches under warrants are unreasonable within the prohibition of our Constitution unless there is a specific statute in Arkansas, or an Act of the English Parliament passed prior to the founding of Jamestown in 1607, specifically authorizing the specific search.

In *Grimmet, supra,* the court points out that the search warrants for contraband became a part of the common law of England by an Act of Parliament in 1622. It is then pointed out in *Grimmett* that the common law of England was adopted at the founding of Jamestown on March 24, 1607, and concludes, in effect, that we just missed having common law authority for contraband search warrants by 15 years and therefore there was no authority for the issuance of the search warrant in the *Grimmett* case; and the majority in the case at bar concludes that since we so held in the *Grimmett* case, the appellant Morris must also go free.

The majority in *Grimmett* points out how the search warrant law of England pertaining to *stolen property*

became imbedded in the common law by "imperceptible practice," but they completely overlook the imperceptible practice in these United States including Arkansas where only *unreasonable* searches are prohibited by the Constitution under the police power of the state, and where all powers are reserved to the people not prohibited by the Constitution.

As I interpret the majority opinion it would apply the term "contraband" to anything the possession of which is prohibited by law, and on the basis of *Grimmett* v. *State, supra,* would send law enforcement officers to the legislature rather than to the courts of this state for authority to search out and seize narcotic drugs destined for the illegal market even when illegally possessed, packaged, and stored by known drug pushers within the sanctity of their private domains.

It is my view that the majority fails to distinguish between common law "contraband" and hard narcotic drugs in the possession of individuals in strict violation of the criminal laws. It is perfectly obvious that the majority fails to distinguish *Grimmett* v. *State, supra,* from the case at bar. *Grimmett* is distinguished from the case at bar in the first paragraph of that opinion where we said:

> "Grimmett, a dispensing physician of Waldo, Arkansas, was convicted of failing to maintain a complete and accurate record of drugs, contrary to the Arkansas Drug Abuse Control Act, Ark. Stat. Ann. § 82-2101, et. seq. (Supp. 1971."

Grimmett was not charged with the *unlawful possession of drugs* in violation of the law. He had the perfect right to have the drugs he did have in his possession. He was charged and convicted for failure to keep proper records of what he did with the drugs he legally had in his possession. Even the first portion of the statute under which Grimmett was charged distinguishes that case from the case at bar. The statute under which Grim-

mett was charged, Ark. Stat. Ann. § 82-2107 (a) (Supp. 1971) provides:

"No person shall manufacture, compound or process [not possess] in this State any depressant or stimulant drugs, except that this prohibition shall not apply to the following persons whose activities in connection with any drug are as specified in this subsection:
* * *
(a) (5) Practitioners licensed in this State to prescribe or administer depressant or stimulant drugs, while acting in the course of their professional practice."

As above stated, Grimmett was convicted under a separate section of the above statute for failure to maintain a complete and accurate record of drugs and although he had a perfect right to have the drugs in his possession, his drugs as well as his records were taken under a search warrant for the purpose of measuring his records against his supply of drugs, and his drugs as well as his records were used in evidence against him at his trial.

In the case at bar the appellant Morris was not a licensed physician not was he charged with the manufacture, compounding or processing of stimulant drugs in this state. Morris was charged with the possession of LSD in violation of Ark. Stat. Ann. § 82-2110 (Supp. 1971) which simply provides:

"It shall be unlawful for any person, except as provided herein, to use, possess, have in one's possession, sell, exchange, give or attempt to give to another, barter or otherwise dispose of: * * * LSD * * *"

In the case at bar, Morris maintained an apartment frequented by young people of unusual demeanor and in unusual numbers. A police officer talked with Morris who appeared at his door armed with a pistol and the officer had reasonable grounds to suspect that Morris

possessed LSD in his apartment. A search warrant was issued and served, LSD was found in Morris' possession. Morris was charged with possession and was convicted. This case is quite different on its facts from *Grimmett.*

In the 1946 case of *Harris* v. *United States,* 331 U. S. 145, the defendant was convicted for the *unlawful possession,* concealment and alteration of notice of classification cards in violation of the Selective Service Act. In that case the court said:

> ". . .[T]he objects sought for and those actually discovered were properly subject to seizure. This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and *property the possession of which is a crime.* * * *
>
> The dangers to fundamental personal rights and interests resulting from excesses of law-enforcement officials committed during the course of criminal investigations are not illusory. This Court has always been alert to protect against such abuse. But we should not permit our knowledge that abuses sometimes occur to give sinister coloration to procedures which are basically reasonable." (Emphasis added).

In *Camden County Beverage Co.* v. *Blair,* 46 F. 2d 648, revenue agents forcibly entered and *without a search warrant* took samples from the beverage plant, and in that case the court said:

> "While it is true that generally the Fourth and Fifth Amendments may be construed together, there is a clear distinction between the seizing of contraband articles, or property illicitly possessed, and the ob-

taining of papers or writings which may be produced as evidence against the possessor in a criminal, penal, or forfeiture proceeding. The former may be seized on a valid search warrant, or without warrant, if the circumstances justify it; whereas the seizure of the latter, unless under exceptional circumstances, by any means is always unlawful.

In Gouled v. United States, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647, Mr. J. Clarke, who delivered the opinion of the court said:

'Although search warrants have thus been used in many cases ever since the adoption of the Constitution, and although their use has been extended from time to time to meet new cases within the old rules, nevertheless it is clear that, at common law and as the result of the Boyd and Weeks Cases, supra, they may not be used as a means of gaining access to a man's house or office and papers *solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding, but that they may be resorted to only* when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or *when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken.* Boyd Case [116 U. S.] pp. 623, 624 S. Ct. 524, 29 L. Ed. 746.' Page 309 of 255 U. S., 41 S. Ct. 261, 265.'' (Emphasis supplied).

In the 1926 New York case of *People* v. *Defore,* 211 N. Y. S. 134, the defendant was convicted of criminally carrying and possessing a balckjack. The court, citing from *Boyd* v. *United States,* 116 U.S. 616, said:

" 'The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining in-

formation therein contained, or of using them as evidence against him. The two things differ toto coelo. In the one case the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to aviod the duties payable on them, has been authorized by English statutes for at least two centuries past, and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the Act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of the body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the Amendment. So, also, the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures.' "

In addition to the language from *Gouled* v. *United States,* 255 U. S. 298, cited in *Camden County Beverage Co.* v. *Blair, supra,* the Court in *Gouled* also said:

"There is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized, and if they be adequately described in the affidavit and warrant. Stolen or forged papers have been so seized. *Langdon* v. *People,* 133 Illinois, 382, and lottery tickets, under a statute prohibiting their possession with intent to sell them, *Commonwealth* v. *Dana,* 2 Metc. 329, and we cannot doubt that contracts may be so used as instruments or agencies for perpetrating

frauds upon the Government as to give the public an interest in them which would justify the search for and seizure of them, under a properly issued search warrant, for the purpose of preventing further frauds."

In the 1966 case of *Cooper* v. *California,* 386 U. S. 58, the court said:

". . . [T]he question here is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search *not expressly authorized by state law be justified as a constitutionally reasonable one.*

\* \* \*

It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' *United States* v. *Rabinowitz,* 339 U.S. 56, 66." (Emphasis supplied).

To summarize in two short sentences: The majority hold that there was no constitutional or statutory authority for the issuance of the search warrant in this case. It is my position that there was no constitutional or statutory prohibition against it.

I would affirm the judgment.